

2005 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

1-28-2005

# Woloszyn v. Lawrence

Precedential or Non-Precedential: Precedential

Docket No. 03-2390

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2005

Recommended Citation

"Woloszyn v. Lawrence" (2005). *2005 Decisions.* Paper 1527.
http://digitalcommons.law.villanova.edu/thirdcircuit_2005/1527

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2005 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

No: 03-2390

PATRICIA A. WOLOSZYN, ADMINISTRATRIX
OF THE ESTATE OF RICHARD LEE WOLOSZYN, JR.
ON BEHALF OF THE ESTATE OF RICHARD LEE
WOLOSZYN JR., AND PATRICIA A. WOLOSZYN,
ADMINISTRATRIX OF THE ESTATE OF RICHARD LEE
WOLOSZYN, JR. ON BEHALF OF THE NEXT OF KIN OF
RICHARD LEE WOLOSZYN, JR.,

Appellant

v.

COUNTY OF LAWRENCE; WILLIAM F. HALL,
WARDEN OF THE LAWRENCE COUNTY JAIL;
MATTHEW GRAZIANI, and/or MICHAEL SAINATO

Appeal from the United States District Court
for the Western District of Pennsylvania
(Civil No. 01-cv-01361)
District Judge: Hon. Arthur J. Schwab

Argued: May 12, 2004

Before: NYGAARD, MCKEE and CHERTOFF,

Circuit Judges

(Opinion filed: January 28, 2005)

CHARLES E. EVANS, ESQ.
MARK E. MILSOP, ESQ.  (Argued)
Evans, Portnoy, Quinn & O'Connor
36th Floor
One Oxford Centre
301 Grant Avenue
Pittsburgh, PA 15219
Attorneys for appellant

JOHN P. SIEMINSKI, ESQ.  (Argued)
Burns, White & Hickton, L.L.C.
120 Fifth Avenue
Suite 2400
Pittsburgh, PA 15222
Attorneys for appellees

OPINION

McKEE, Circuit Judge.

We are asked to review the district court's grant of summary judgment in favor of individual and municipal defendants in a suit brought pursuant 42 U.S.C. § 1983 and Pennsylvania's Wrongful Death and Survival statutes, 42 PA. CONS. STAT. ANN. §§ 8301, 8302.  The suit arises from the jailhouse suicide of a pre-trial detainee.  For the reasons that follow, we will affirm.

2

## I. FACTS

On July 21, 1999, Richard Lee Woloszyn, Jr., was arrested by local police after attempting to burglarize a private residence in Ellwood City, Pennsylvania. The officers took Woloszyn to the Ellwood City Police Station where he voluntarily waived his right to counsel and signed a statement admitting the illegal entry. Following arraignment on those charges, police took Woloszyn to the Lawrence County Correctional Facility ("LCCF") where he was to be held. In an Incident Investigation Report, Officer List wrote that on the way to the LCCF, he and Lieutenant Gilchrist spoke with Woloszyn who "appeared to be in good spirits and was joking . . .". Officer List also wrote:

> He told us how he got caught cheating on his wife with the neighbor lady. I told him he better watch that his wife might kick his butt. He advised us that he was lucky that they didn't have a gun in his house because she would have shot him years ago. Then he said maybe that might have been the best thing for everybody. I told him not to talk like that.

According to List, "[Woloszyn] appeared to be in good spirits[]" when they arrived at the LCCF. In his deposition, List testified that Woloszyn did not show any signs of depression on the way to the LCCF. On the contrary, List testified that Woloszyn was "in fairly good spirits" and was "talking and joking with us."

3

After arriving at the LCCF, Woloszyn was interviewed by Correction Officer Linda Hartman-Swanson. In her affidavit, she stated that while he was being booked, Woloszyn

> was very remorseful and distant. He was not answering my questions, but wanted to talk about how he had failed as a father and a person. He talked about how when he was young the children would come to him, but now they would go to his wife instead, he said "that really hurts me." He said that he was glad that he got caught because he wanted it to stop, he was on a 24 hour rampage, he had done every drug possible from alcohol to heroin, to crack cocaine and acid.

Hartman-Swanson asked Captain Adamo to keep Woloszyn in the booking area rather than assign him to a cell. She claimed that Adamo initially agreed, but changed his mind after Annette Houck, the LCCF nurse on duty, cleared Woloszyn for Housing Unit B ("HB Unit"). Prisoners are placed there for observation before being placed in the general jail population. According to Hartman-Swanson, Capt. Adamo told her that he would put Woloszyn on five minute checks . However, Capt. Adamo also said that he would follow the nurse's advice.

Hartman-Swanson testified in her deposition that Woloszyn told her that he was not suicidal. One of the questions on the LCCF Booking Questionnaire asked if "the inmate's conversation or actions suggest the risk of suicide" and had a place to check either "yes" or "no." Hartman-Swanson completed that form by checking, "no."

4

Nurse Houck performed a medical assessment of Woloszyn at the LCCF. Woloszyn was polite, cooperative, alert and not agitated. His respiration and blood pressure were normal and he was oriented to person, place and time. Although the nurse was aware that Woloszyn had claimed to be under the influence of street drugs, he did not appear to be under the influence of drugs or alcohol during her assessment. Woloszyn told Houck that he was not being treated by a psychiatrist and had no psychiatric history. According to Houck, Woloszyn did not request a counselor or physician at any point during his medical assessment. Based upon her medical assessment, Houck did not believe that Woloszyn should be placed on suicide watch. In her opinion, there was no indication that he intended to harm himself. She therefore informed Adamo that Woloszyn was medically stable and could be placed in the HB Unit. She did, however, recommend that Woloszyn be checked hourly for signs of alcohol withdrawal. Consistent with Houck's recommendation, Adamo placed Woloszyn on one hour checks based upon concerns related to alcohol withdrawal.

Correction Officer Sainato escorted Woloszyn from the booking area to HB Unit. He did not observe anything unusual about Woloszyn's mood or behavior. Correction Officer Graziani, the officer on duty in the HB Unit when Woloszyn arrived there at 7:20 p.m., also noticed nothing unusual or remarkable about Woloszyn's behavior. When Woloszyn arrived in HB Unit Woloszyn was able to state and spell his name when Graziani asked him to, and Graziani then placed Woloszyn in his cell. When Graziani later asked Woloszyn

5

what kind of drink he wanted in the morning, Woloszyn yelled back that he wanted juice.

The record also contains an unsworn statement from Wayne Shaftic, an inmate in the cell next to Woloszyn. Shaftic claims that Woloszyn requested a counselor, and that Woloszyn was yelling, screaming, and kicking for more than 45 minutes, but that no one responded. Specifically, Shaftic's statement said, in relevant part:

> You could tell the kid was strung out. He was confused. . . . He wanted to see a counselor and was told to go to his cell, "lay it down" and they would contact a counselor in the morning. He said he shouldn't be here, that he needed a counselor. He said he needed help, he didn't belong here. . . . I hear the kid in the cell going nuts, yelling and screaming and punching the metal top bunk. The kid was loud, real loud. . . . And the kid was screaming loudly. He screamed disjointedly about himself. . . . Like self blame. I could tell he was kicking his locker also. It was a constant commotion for at least 45 minutes until I talked to him. No one had come up to his cell. The guard at the desk all of this time was Matthew Graziani and he was looking thru vacation brochures. He never made a walk around until I started to talk to the kid. . . . [Woloszyn] said he had been partying for the last 3 days and he could not be in this cell – he needed to get out of the cell. . . . I believe

6

Graziani made his walk around about 6 p.m. and I watched him. That day Graziani never even looked in our cells. He didn't say anything and didn't look our way. He walked past us, went to the end, turned around and walked past us a second time.

Prisoners in the HB unit were checked every 30 minutes.[1] At 8:14 p.m., Graziani began to check the HB Unit. He finished by 8:20 p.m. At approximately 8:52 p.m., Graziani found Woloszyn hanging by the neck in his cell. Woloszyn had apparently taken a sheet from his cell bunk, tied it to an unscreened ceiling vent in his cell, and hanged himself. Graziani called a "code blue" and attempted to prop Woloszyn up to alleviate the pressure on his neck. Correction Officers Sainato and Stiles then entered the cell and assisted Graziani in untying the sheet that was knotted around Woloszyn's neck. They checked Woloszyn's pulse and respiration, and found none.

Stiles and Graziani then began performing CPR while another corrections officer was sent for a protective breathing mask.[2] Although a protective mask should have been kept in

---

[1]Graziani testified that he was told to check on Woloszyn every hour for signs of alcohol withdrawal.

[2] Although it is not clear from the record, we assume that a "protective breathing mask," is a mask designed to afford some measure of hygiene to persons performing CPR.

7

the HB Unit, none could be found. However, Officers Graziani and Stiles began taking turns performing chest compression and mouth-to-mouth resuscitation without waiting for a protective breathing mask. When the mask finally did arrive, Graziani initially inserted it backwards. The error was immediately corrected,[3] however, and thereafter the mask was used properly as Officers Graziani, Stiles, Piatt and Hartman-Swanson took turns performing mouth-to-mouth resuscitation and chest compressions. They continued until paramedics arrived and took Woloszyn to the hospital where he died.

## II. DISTRICT COURT PROCEEDINGS

Woloszyn's widow, Patricia, filed the instant § 1983 action and state wrongful death and survival actions against Lawrence County, William F. Hall, the warden of LCCF, and Correction Officers Graziani and Sainato. Mrs. Woloszyn filed the action in her capacity as administratrix of Woloszyn's estate. To state a claim under § 1983, a plaintiff "must allege both a deprivation of a federally protected right and that this deprivation was committed by one acting under color of state law." *Lake v. Arnold*, 112 F.3d 682, 689 (3d Cir. 1997). Mrs.

---

[3]In her affidavit, Hartman-Swanson explains: "I went down to observe how they were doing CPR. They were using a one way mask which was turned the wrong way so they were not getting any air into him. I turned the mask around and started breathing. I had to show Captain Adamo how to do compressions." However, in his deposition, Graziani testified that he turned the mask around.

8

Woloszyn alleged violations of Woloszyn's Eighth and Fourteenth Amendment rights.[4] The defendants filed an answer denying liability. After discovery, the district court granted the defendants' motion for summary judgment, and this appeal followed.

## III. DISCUSSION

We exercise plenary review of the district court's grant of summary judgment. *Curley v. Klein*, 298 F.3d 271, 276 (3d Cir. 2002). "[W]e review the record to determine whether the defendants, the moving parties, have demonstrated that there is no genuine issue of material fact." *Colburn v. Upper Darby Township*, 946 F.2d 1017, 1020 (3d Cir. 1991). In order to defeat the defendants' motion, the plaintiff "must introduce more than a scintilla of evidence showing that there is a genuine issue for trial; she must introduce evidence from which a rational finder of fact could find in her favor." *Id.* (citation and internal quotations omitted).

Mrs. Woloszyn presents two arguments in her appeal. First, she argues that the district court erred in granting summary judgment to Correction Officer Graziani because he failed to make five minute checks on Woloszyn and failed to have a breathing mask available in a proper location in HB Unit. Second, she argues that it was error to grant summary

---

[4] For clarity, we will refer to the decedent, Richard Lee Woloszyn, Jr. as "Woloszyn," and we will refer to his wife, Patricia, as "Mrs. Woloszyn," or "Woloszyn's wife."

judgment to Lawrence County and Warden Hall because the LCCF failed to have adequate polices, procedures and training in place.

## A. General Legal Principles.

Woloszyn was a pre-trial detainee when he committed suicide. We first examined liability under § 1983 for such suicides in *Colburn v. Upper Darby Township*, 838 F.2d 663 (3d Cir. 1988) ("*Colburn I*"). There, we held that "if [custodial] officials know or should know of the particular vulnerability to suicide of an inmate, then the Fourteenth Amendment imposes on them an obligation not to act with reckless indifference to that vulnerability." *Id*. at 669. We later elaborated upon that standard in *Colburn v. Upper Darby Township*, 946 F.2d 1017 (3d Cir. 1991) ("*Colburn II*"), where we wrote that

> a plaintiff in a prison suicide case has the burden of establishing three elements: (1) the detainee had a "particular vulnerability to suicide," (2) the custodial officer or officers knew or should have known of that vulnerability, and (3) those officers "acted with reckless indifference" to the detainee's particular vulnerability.

*Colburn II*, 946 F.2d at 1023.

In *Colburn II*, we explained that *Colburn I* rested primarily upon the Supreme Court's decision in *Estelle v. Gamble*, 429 U.S. 97 (1976). *Estelle* involved an Eighth Amendment claim arising from allegations of inadequate

10

medical care.[5]  *Colburn II*, 946 F.2d at 1023.  We noted in *Colburn II* that the Supreme Court held in *Estelle*, that "prison officials violate the Eighth Amendment's proscription of cruel and unusual punishment when they exhibit 'deliberate indifference to serious medical needs of prisoners.'" *Colburn II*, at 1023. (citing *Estelle*, 429 U.S. at 104).  The *Estelle* standard "'requires deliberate indifference on the part of prison officials and [that] the prisoner's medical needs . . . be serious.'" *Colburn II*, 946 F.2d at 1023 (quoting *Monmouth County Correctional Inst. Inmates v. Lanzaro*, 834 F.2d 326 (3d Cir. 1987)).

---

[5]Because a pre-trial detainee has not been convicted of any crime, the due process clause of the Fourteenth Amendment prohibits the state from imposing punishment. *Bell v. Wolfish*, 441 U.S. 520, 535  (1979).  Nevertheless, in developing our jurisprudence on pre-trial detainees' suicides we looked to the Eighth Amendment, which prohibits the infliction of cruel and unusual punishment on convicted prisoners, because the due process rights of pre-trial detainees are at least as great as the Eighth Amendment rights of convicted and sentenced prisoners, *see Boring v. Kozakiewicz*, 833 F.2d 468, 471-472 (3d Cir. 1987), and because "no determination has as yet been made regarding how much more protection unconvicted prisoners should receive." *Kost v. Kozakiewicz*, 1 F.3d 176, 188 n.10 (3d Cir. 1993). *See Whitley v. Albers*, 475 U.S. 312, 327 (1986) (noting that the Court has reserved the question of whether pre-trial detainees are entitled to greater protections than convicted prisoners "outside the prison security context.")

The detainee's condition must be such that a failure to treat can be expected to lead to substantial and unnecessary suffering, injury, or death. Moreover, the condition must be one that has been diagnosed by a physician as requiring treatment or one that is so obvious that a lay person would easily recognize the necessity for a doctor's attention.

*Colburn II*, 946 F.2d at 1023 (citation and internal quotations omitted).

A particular vulnerability to suicide represents a serious medical need. *Colburn* II, 946 F.2d at 1023. "The requirement of a 'particular vulnerability to suicide' speaks to the degree of risk inherent in the detainee's condition." *Colburn II*, 946 F.2d at 1024. "[T]here must be a strong likelihood, rather than a mere possibility, that self-inflicted harm will occur." *Id.* (citations omitted).

However, "[e]ven where a strong likelihood of suicide exists, it must be shown that the custodial officials 'knew or should have known' of that strong likelihood." *Colburn II*, 946 F.2d at 1024. "[I]t is not necessary that the custodian have a subjective appreciation of the detainee's 'particular vulnerability.'" *Id.* at 1024-25. "Nevertheless, there can be no reckless or deliberate indifference to that risk unless there is something more culpable on the part of the officials than a negligent failure to recognize the high risk of suicide." *Id.* at 1025. Therefore, the "should have known" element

12

does not refer to a failure to note a risk that would be perceived with the use of ordinary prudence. It connotes something more than a negligent failure to appreciate the risk of suicide presented by a particular detainee, though something less than subjective appreciation of that risk. The strong likelihood of suicide must be so obvious that a lay person would easily recognize the necessity for preventative action; the risk of self-inflicted injury must not only be great, but also sufficiently apparent that a lay custodian's failure to appreciate it evidences an absence of any concern for the welfare of his or her charges.

*Id.* (citation and internal quotations omitted).

"[N]either the due process clause with its focus on arbitrariness and abuse of power, nor the Eighth Amendment with its focus on the unnecessary and wanton infliction of pain, imposes liability for a negligent failure to protect a detainee from self-inflicted injury." 946 F.2d at 1024. We referred to that level of culpability as "reckless indifference" in *Colburn I*. 838 F.2d at 669. In *Williams v. Borough of West Chester*, 891 F.2d 458, 465 (3d Cir. 1989), a case decided after *Colburn I* but before *Colburn II*, we referred to the heightened culpability that is required as "deliberate indifference." However, we did not elaborate upon those terms in either case. It was not necessary to elaborate upon either term in *Colburn II*. Instead, we simply said that "a level of culpability higher than a negligent failure to protect from self-inflicted harm is required and . . . this requirement is relevant to an evaluation of the first two *Colburn*

13

*I* elements as well as the third." 946 F.2d at 1024.

The phrase, "deliberate indifference" first appeared in *Estelle v. Gamble*. 429 U.S. at 104. However, the Court did not define the term with precision. Rather, the Court explained that it was "a state of mind more blameworthy than negligence." *Farmer v. Brennan*, 511 U.S. 825, 835 (1994). The Court did more precisely define the phrase in *Farmer v. Brennan*. However, there, the Court was referring to the degree of culpability that would support liability under the Eighth Amendment. The Court explained:

> [A] prison official cannot be found liable under the Eighth Amendment for denying an inmate humane conditions of confinement unless the official knows of and disregards an excessive risk to inmate health and safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.

511 U.S. at 837.

In *Beers-Capital v. Whetzel*, 256 F.3d 120 (3d Cir. 2001), we placed the following gloss on *Farmer:*

> To be liable on a deliberate indifference claim, a . . . prison official must both know of and disregard  an excessive risk to inmate health or safety.  The . . . element of deliberate indifference is subjective, not objective . . . meaning that the

14

official must actually be aware of the existence of the excessive risk; it is not sufficient that the official should have been aware. However, subjective knowledge on the part of the official can be proved by circumstantial evidence to the effect that the excessive risk was so obvious that the official must have known of the risk. Finally, a defendant can rebut a prima facie demonstration of deliberate indifference either by establishing that he did not have the requisite level of knowledge or awareness of the risk, or that, although he did know of the risk, he took reasonable steps to prevent the harm from occurring.

256 F.3d at 133 (citations, internal quotations and brackets omitted).

*Farmer* defined "deliberate indifference" in the context of the claim of a convicted prisoner under the Eighth Amendment. It does not, therefore, directly control our analysis here because, as we have explained, Woloszyn's claim arises under the Due Process Clause of the Fourteenth Amendment. Nevertheless, because our § 1983 jurisprudence in custodial suicides borrows the term "deliberate indifference" from Eighth Amendment jurisprudence, "deliberate indifference" may be equivalent to the "should have known" element required for § 1983 liability under the Fourteenth Amendment pursuant to *Colburn I* and *II*. However, we need not attempt to reconcile those two phrases here because there is no evidence on this record that Woloszyn had a particular vulnerability to suicide.

15

Accordingly, his wife can not establish the first element under *Colburn I* and *II*.

## B. Liability of Graziani.

Woloszyn's wife argues that, considering Hartman-Swanson's affidavit and Shaftic's unsworn statement,

> it is clear that Woloszyn was assigned to unit HB where . . . Graziani was the assigned corrections officer. At the time of Woloszyn's transfer, he was the subject of an order requiring five minute suicide checks. After arriving at unit HB, Woloszyn requested a counselor. Thereafter, Woloszyn engaged in behavior which would have alerted any reasonable person to a problem including yelling, screaming, and punching which . . . Shaftic described as Woloszyn going "nuts." In spite of all of this, . . . Graziani, by his own admission to . . . [Hartman-Swanson] "was supposed to do five minute checks but did not go up to check until he was found."

Mrs. Woloszyn argues that Graziani was therefore aware of Woloszyn's vulnerability to suicide because he was ordered to perform 5 minute checks, and his failure to do so establishes the requisite reckless indifference to Woloszyn's vulnerability.

However, her argument reads too much into this record. Woloszyn was not subject to five minute *suicide checks*. In fact, he was not under five minute checks at all. Adamo did tell

16

Hartman-Swanson that he would put Woloszyn on five minute checks, but Hartman-Swanson also affirmed that Adamo thereafter stated he would follow the nurse's advice. Nurse Houck testified that Woloszyn was polite, cooperative and alert, and oriented in place and time. Woloszyn did not request a counselor or psychiatrist and, absent Shaftic's "statement," there was no indication that Woloszyn needed one or that he intended to harm himself. Therefore, Houck did not place Woloszyn on a suicide watch or order five minute checks on his cell. Instead, she merely placed him on one hour checks for signs of alcohol withdrawal. Accordingly, Adamo placed Woloszyn on one hour checks as the nurse suggested or ordered, but he was to be observed for signs of withdrawal; he was not on a suicide watch as Mrs. Woloszyn now argues.

Furthermore, Mrs. Woloszyn has not shown that there are any genuine issues of material fact as to Woloszyn's particular vulnerability to suicide. As we explained in *Colburn II*, "the requirement of a 'particular vulnerability to suicide' speaks to the degree of risk inherent in the detainees condition. . . . [T]here must be 'a strong likelihood, rather than a mere possibility, that self-inflicted harm will occur.'" 946 F.3d at 1024. Officer List testified that when he, Lt. Gilchrist and Woloszyn arrived at the LCCF, Woloszyn appeared to be in good spirits and was talking and joking with them. Hartman-Swanson affirmed that Woloszyn specifically denied being suicidal. Additionally, Hartman-Swanson indicated in the Booking Questionnaire that there was nothing in Woloszyn's conduct or actions that suggested that Woloszyn was suicidal. As we have just noted, Nurse Houck did not recommend a suicide watch because Woloszyn's medical assessment did not

17

suggest that was necessary or appropriate. Graziani and Sainato both testified that Woloszyn's behavior upon arrival at the HB unit was unremarkable. Finally, Graziani testified that Woloszyn spelled his name to him and told Graziani that he wanted a glass of juice in the morning.

Mrs. Woloszyn argues that statements in Hartman-Swanson's affidavit demonstrate that Woloszyn had a particular vulnerability to suicide. As noted above, Hartman-Swanson said that Woloszyn was remorseful and distant, was not answering her questions, was talking about having failed as a father; and he admitted having been on a 24 hour drug and alcohol binge. However, we do not think such statements, without more, are sufficient to create a genuine issue of material fact regarding knowledge of Woloszyn's vulnerability to suicide. They do not show that there was "a strong likelihood, rather than a mere possibility, that self-inflicted harm will occur."

We also must disagree with Mrs. Woloszyn's interpretation of another reference in the Hartman-Swanson affidavit. In her affidavit, Hartman-Swanson stated:

> Matthew Graziani told me he was supposed to do five minute checks but did not go up to check until [Woloszyn] was found. He was remorseful at the time and said "but Linda I did not go up and check on him." More recently Matthew Graziani said it was no big thing, it was just another druggy. This was a couple of days later.

That statement would allow a reasonable juror to conclude that

18

Graziani should have been checking on Woloszyn every five minutes and that he failed to do so. It would also allow the fact finder to conclude that Graziani was callous and unsympathetic. However, it would still not establish a particular vulnerability that would create a strong likelihood of suicide. That reference to Graziani does not, therefore, advance the appropriate inquiry under *Colburn I* and *II*.

The only evidence that could raise a genuine issue of material fact on this record is Shaftic's unsworn statement. The district court did not consider that statement. The court reasoned that since the statement was not in affidavit form, it was not "sufficient . . . to rely upon . . . in disposing of the pending motion for summary judgment." We believe the court's handling of that unsworn statement was appropriate. *See Adickes v. S. H. Kress & Co.*, 398 U.S. 144, 158 n.17 (1970) (noting that an unsworn statement does not satisfy the requirements of Fed.R.Civ.P. 56(e)).

Woloszyn's wife did file an appropriate motion to prevent the entry of summary judgment under Fed.R.Civ.P. 56(f). That Rule, captioned "When Affidavits are Unavailable," provides:

> Should it appear from the affidavits of a party opposing the motion that the party cannot, for reasons stated, present by affidavit facts essential to justify the party's opposition, the court may refuse the application for judgment or may order a continuance to permit affidavits to be obtained or depositions to be taken or discovery to be had

19

or may make such other order as is just.

Fed.R.Civ.P. 56(f). Shaftic's unsworn statement was dated March 28, 2000. In an affidavit attached to the Rule 56(f) motion, counsel for Mrs. Woloszyn affirmed that he was unable to obtain a sworn affidavit from Shaftic because he was a fugitive. However, counsel also intimated that Shaftic had been incarcerated at the LCCF, but that prison officials had informed counsel that Shaftic had been released. In any event, Woloszyn's wife asked the district court to deny the defendants' motion for summary judgment because she could not then locate Shaftic to obtain his sworn statement or depose him.

In denying Mrs. Woloszyn's Rule 56(f) motion, the court wrote:

> It is further noted, that nearly 3 years after the "statement" was provided, and only after briefing and conferences with this Court occurred with respect to summary judgment, that [Mrs. Woloszyn] moved this Court pursuant to F.R.C.P. 56(f) to deny summary judgment. That Motion was denied based upon the fact that the [she] had previously responded in substance to the pending Motion for Summary Judgment.

Mrs. Woloszyn does not now argue that the district court abused

20

its discretion in denying her Rule 56(f) motion.[6] Rather, she contends that the court should have granted it without giving reason or authority for that contention. Moreover, she does not now claim that she would have been able to obtain an affidavit from Shaftic or depose him had she been afforded that opportunity.

Finally, Mrs. Woloszyn argues that the district court erred by granting summary judgment to Graziani because Graziani failed "to maintain a breathing mask in a proper location." However, that argument borders on frivolity. Earlier, we noted that Stiles and Graziani performed CPR while another corrections officer went to look for a protective breathing mask. In Mrs. Woloszyn's view, "Graziani's failure to maintain a breathing mask in its designated location is an independent basis for denial of summary judgment" because it shows his deliberate indifference. However, she points to nothing in the record that suggests that Graziani was responsible for ensuring that a protective breathing mask would always be present in HB Unit. More importantly, Stiles and Graziani immediately initiated CPR on Woloszyn without waiting for a protective mask to arrive. They continued administering CPR, apparently in disregard for their own safety and hygiene, until Corrections Officer Piatt returned with a protective breathing mask. Aside from suggesting that Graziani's deposition is self-serving, Mrs. Woloszyn offers nothing to contradict Graziani's testimony that

---

[6]We review the district court's denial of a Rule 56(f) motion for discovery under an abuse of discretion standard. *Bradley v. United States*, 299 F.3d 197, 206 (3d Cir. 2002).

he started CPR immediately. Moreover, Mrs. Woloszyn does not claim that immediate use of a protective breathing mask would somehow have prevented Woloszyn's death.

Thus, even assuming *arguendo* that Graziani was responsible for ensuring that a protective mask was available in the HB Unit, its unavailability has no bearing on the issues here. *Colburn II*, 946 F.2d at 1024.

## C. Liability of Lawrence County.

Mrs. Woloszyn argues that the county is liable because it failed to train its corrections officers to identify and prevent suicides, and failed to provide them with readily available equipment to resuscitate inmates who might attempt suicide.

Municipal liability can be predicated upon a failure to train. *City of Canton v. Harris*, 489 U.S. 378 (1989).[7] However, a municipality is only liable for failing to train when that "failure amounts to 'deliberate indifference to the [constitutional] rights of persons with whom the police come in contact.'" *Colburn II*, at 1028 (quoting *City of Canton*, 489 U.S. at 388).

> Only where a municipality's failure to train its employees in relevant respect evidences a

_____

[7]In *City of Canton*, the plaintiff claimed that her constitutional rights were violated when she was denied medical care while detained in municipal jail.

> "deliberate indifference" to the rights of its
> inhabitants can such a shortcoming be properly
> thought of as a city "policy or custom" that is
> actionable under § 1983. . . . Only where a failure
> to train reflects a "deliberate" or "conscious"
> choice by a municipality – a "policy" as defined
> by our prior cases – can a city be liable for such a
> failure under § 1983.

*City of Canton*, 489 U.S. at 389. Therefore, not all failures or
lapses in training will support liability under § 1983. Moreover,
"'the identified deficiency in [the] training program must be
closely related to the ultimate [constitutional] injury." *Colburn
II*, 946 F.2d at 1028 (quoting *City of Canton*, 489 U.S. at 391).
In *City of Canton*, the Court stressed that a plaintiff asserting a
failure to train theory is "required to prove that the deficiency in
training actually caused [the constitutional violation, i.e.,] the
[police custodian's] indifference to her medical needs." *City of
Canton*, at 391.

In discussing liability for a failure to train claim in the
context of a prison suicide, we have explained:

> *City of Canton* teaches that . . . [i]n a prison
> suicide case, [under § 1983] . . . the plaintiff must
> (1) identify specific training not provided that
> could reasonably be expected to prevent the
> suicide that occurred, and (2) must demonstrate
> that the risk reduction associated with the
> proposed training is so great and so obvious that
> the failure of those responsible for the content of

23

the training program to provide it can reasonably be attributed to a deliberate indifference to whether the detainees succeed in taking their lives.

*Colburn II*, 946 F.2d at 1029-30.

Here, Woloszyn's wife points to the affidavit and report of R. Paul McCauley, Ph.D., a professor of criminology and former chairperson of the Department of Criminology at Indiana University of Pennsylvania. He identified the following as deficiencies in Lawrence County's training:

The facility failed to have in place appropriate intake documents necessary to the evaluation and prevention of suicide;

The facility failed to have in place a policy which would have resulted in Woloszyn either being placed in a cell for prisoners at risk for suicide or with another person. Instead, Mr. Woloszyn was assigned to a cell with vented bunk (i.e. with an open hole through which a blanket could be tied) and a blanket. Mr. Woloszyn's suicide occurred by use of the vent and blanket;

The staff was not qualified to assess and prevent suicide;

Emergency medical equipment was not located and personnel were not properly trained in its use.

24

The training deficiencies McCauley identified are as broad and general as they are conclusory. Prof. McCauley does not identify specific training that would have alerted LCCF personnel to the fact that Woloszyn was suicidal as *Colburn I* and *II* require. He also concludes that Hartman-Swanson "was not trained in suicide prevention and did not have a way to formally prepare a meaningful suicide risk assessment for Mr. Woloszyn." However, he never identified specific training that could reasonably have caused Hartman-Swanson to assess whether Woloszyn's behavior and demeanor indicated that Woloszyn posed a risk of suicide.[8]

McCauley also opined that Lawrence County's training was deficient because emergency medical equipment was not available in HB Unit and personnel were not properly trained in its use. This alleged deficiency relates to Mrs. Woloszyn's claim that a protective breathing mask was not immediately available, and that it was inserted backwards when finally brought to the HB unit. However, we have already explained that Stiles and Graziani started CPR without waiting for a protective breathing mask, and there is no suggestion that they did so improperly. Therefore, we fail to see the significance of the initial absence of a breathing mask. In addition, even if Graziani's improper initial insertion of the breathing mask resulted from a lack of training, nothing suggests that it was a

---

[8] For purposes of our analysis, we assume *arguendo* that Woloszyn's conversation with Hartman-Swanson suggested a "particular vulnerability to suicide."

25

significant factor in Woloszyn's tragic death.

The initial unavailability of a breathing mask, and Graziani's improper insertion of it arguably establishes simple negligence, but is little more than a red herring insofar as our inquiry into deliberate indifference is concerned.

## D. Liability of Warden Hall.

Mrs. Woloszyn argues that Warden Hall is individually liable because, as warden of LCCF, he failed "to implement proper training, policies and procedures." Warden Hall can be liable individually under § 1983. *See Stoneking v. Bradford Area Sch. Dist.*, 882 F.2d 720, 725 (3d Cir. 1989). The training, policies and procedures that Mrs. Woloszyn relies upon to establish Hall's liability are rooted in the McCauley affidavit that we have just discussed. We have explained that that affidavit fails to specify training that could have alerted LCCF personnel to Woloszyn's potential for suicide. Accordingly, the district court did not err in granting summary judgment to Warden Hall.

## IV. CONCLUSION

For all of the above reasons, we will affirm the district court's grant of summary judgment to the custodial officials responsible for Woloszyn's custody and the governmental unit which employs them.