

2006 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

2-23-2006

# Schuenemann v. USA

Precedential or Non-Precedential: Non-Precedential

Docket No. 05-2565

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2006

Recommended Citation

"Schuenemann v. USA" (2006). *2006 Decisions*. Paper 1544.
http://digitalcommons.law.villanova.edu/thirdcircuit_2006/1544

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova University School of Law Digital Repository. It has been accepted for inclusion in 2006 Decisions by an authorized administrator of Villanova University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

NOT PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 05-2565
_____

RAYMOND F. SCHUENEMANN;
KATHRYN M. SCHUENEMANN,
Co-Administrators of the Estate
of Paul C. Schuenemann, Deceased,

Appellants

v.

UNITED STATES OF AMERICA;
ALLEGHENY COUNTY, PENNSYLVANIA,
a political subdivision;
ALLEGHENY COUNTY PRISON BOARD,
a division of Allegheny County;
ALLEGHENY COUNTY JAIL,
a department of Allegheny County;
ALLEGHENY CORRECTIONAL HEALTH SERVICES, INC.,
a Pennsylvania Corporation

_____

On Appeal from the United States District Court
for the Western District of Pennsylvania
(D.C. No. 03-cv-00398)
District Judge: Honorable Thomas M. Hardiman

_____

Submitted Under Third Circuit LAR 34.1(a)
February 13, 2006

Before: SCIRICA, *Chief Judge*, BARRY and FISHER, *Circuit Judges*.

(Filed February 23, 2006)

_____

OPINION OF THE COURT
_____

FISHER, *Circuit Judge*.

This civil rights claim arises out of the unfortunate death of Paul C. Schuenemann, who committed suicide while being held in pretrial detention at the Allegheny County Jail. Although we are certainly sympathetic with Schuenemann's parents, who have suffered the tragic loss of their son, we agree with the District Court that there is insufficient evidence to hold the municipal defendants liable for Schuenemann's death. Therefore, we will affirm the judgment of the District Court.

I.

As we write solely for the parties, and the facts are known to them, we will discuss only those facts pertinent to our conclusion. On February 17, 2001, the United States Attorney's Office for the Western District of Pennsylvania filed a criminal complaint against Schuenemann accusing him of committing bank robbery in Clarion, Pennsylvania. That same day, a warrant was issued for Schuenemann's arrest, and, on February 21, 2001, Schuenemann was arrested at the Cincinnati-Northern Kentucky Airport. Over the next month, Schuenemann was incarcerated in federal custody in various institutions. Schuenemann spoke with his parents and his sister on several occasions during that time, and he did not give them any indication that he was depressed or suicidal.

2

On March 21, 2001, Schuenemann was transported by the United States Marshals Service to the Allegheny County Jail ("ACJ"). Schuenemann was examined by Frank Thompson, a licensed practical nurse employed by Defendant Allegheny Correctional Health Services, Inc. ("ACHS").[1] Pursuant to ACHS policy, Thompson conducted an initial physical and mental health screening of Schuenemann, which included completing a form entitled "Suicide Prevention Screen." Based upon Schuenemann's answers to his questions and his training, Thompson determined that Schuenemann had no history of mental illness and that he did not show signs of being suicidal.

The next day, March 22, 2001, Schuenemann appeared before a magistrate judge for his initial appearance, arraignment and detention hearing. At the conclusion of that hearing, the magistrate judge entered an order continuing Schuenemann's detention. None of the individuals who attended the hearing – including Schuenemann's parents, his sister, his defense counsel, and the FBI agent who investigated the robbery – perceived that Schuenemann's behavior during the hearing or after the magistrate judge continued his detention was abnormal.

Immediately following the hearing, and prior to being returned to the ACJ, Schuenemann was interviewed by a Deputy United States Marshal. Schuenemann, who was relaxed and ate lunch during the encounter, told the deputy that he was not suicidal

---

[1] Defendant ACHS is under contract to perform health care services to inmates at the ACJ.

and did not intend to harm himself. Based upon Schuenemann's responses and his own observations, the Deputy Marshal completed two forms informing the ACJ that Schuenemann was not suicidal. Following the interview, Schuenemann was transported back to the ACJ.

Schuenemann was not re-screened by ACHS upon his return to the ACJ. The ACJ had not adopted a policy, informally proposed by ACHS on at least two occasions between November 2000 and March 2001,[2] to re-screen all inmates returning from court appearances for mental health purposes. The next morning, March 23, 2001, however, Schuenemann was interviewed by a caseworker at the ACJ to determine in which "pod" in the ACJ he should be housed. Schuenemann was responsive to all of the caseworker's questions and told the caseworker that he did not intend to harm himself. The caseworker, who had training in suicide prevention, did not observe Schuenemann to have any suicidal tendencies.

Later that same afternoon, Schuenemann asked a corrections officer assigned to his pod for permission to use the prison gymnasium. The corrections officer did not observe that Schuenemann was behaving irregularly. Between 3:00 p.m. and 3:10 p.m., a different corrections officer conducted a count of all the prisoners on the pod, as well as a mandatory cell check, and did not detect anything "out of the ordinary." Less than one

---

[2]Dr. Bruce Dixon, Chairman of the Board at ACHS, testified at his deposition that he could not recall whether the requests were made in writing, and he was unsure as to which prison officials the requests were made.

4

hour later, however, at approximately 4:05 p.m., Schuenemann was found in his cell

"hanging by a rolled up bed sheet tied to the metal locker and wrapped around his neck."

Schuenemann was pronounced dead at 4:46 p.m., and the Coroner's office later declared

that the cause of death was suicide.

## II.

Schuenemann's parents, as administrators of his estate (the "Estate"), brought a

section 1983[3] civil rights claim against Defendants alleging that they violated

Schuenemann's substantive due process rights under the Fourteenth Amendment to the

United States Constitution. The District Court had jurisdiction over the Estate's claim

pursuant to 28 U.S.C. §§ 1331 and 1343(a)(3). On April 15, 2005, the District Court

adopted the Report and Recommendation of the Magistrate Judge and granted summary

judgment in favor of the Defendants. We have appellate jurisdiction over a timely appeal

from a final order of the District Court pursuant to 28 U.S.C. § 1291, and we apply a

---

[3]Section 1983 provides:

> Every person who, under color of any statute, ordinance, regulation,
> custom, or usage, of any State or Territory or the District of Columbia,
> subjects, or causes to be subjected, any citizen of the United States or other
> person within the jurisdiction thereof to the deprivation of any rights,
> privileges, or immunities secured by the Constitution and laws, shall be
> liable to the party injured in an action at law, suit in equity, or other proper
> proceeding for redress.

42 U.S.C. § 1983.

5

plenary standard of review to the District Court's decision to grant summary judgment. *Woloszyn v. County of Lawrence*, 396 F.3d 314, 319 (3d Cir. 2005).

III.

A.

Because Schuenemann was a pretrial detainee, and the Eighth Amendment's protection against cruel and unusual punishment had not yet attached, we analyze Schuenemann's section 1983 claim under the Fourteenth Amendment's substantive due process protection against arbitrary abuse of government power. *Colburn v. Upper Darby Twp.* ("*Colburn I*"), 838 F.2d 663, 668 (3d Cir. 1988). Municipalities, which are considered "persons" under section 1983, may be liable for constitutional torts if two prerequisites are met: (1) the plaintiff's harm was caused by a constitutional deprivation; and (2) the municipal entity is responsible for that violation. *Collins v. City of Harker Heights*, 503 U.S. 115, 120 (1992).[4] A government entity may not be held vicariously liable for the constitutional violations of its agents under a theory of respondeat superior. *Id.* at 122. Rather, municipal entities are only liable under section 1983 "when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the

---

[4]Defendants are each municipal government entities. The Estate has not brought suit against any prison official acting in his or her individual capacity.

6

government as an entity is responsible for under § 1983." *Monell v. Dept. of Social Services*, 436 U.S. 658, 694 (1978).

In *Colburn v. Upper Darby Twp.* ("*Colburn II*"), we explained that a plaintiff in a pretrial detainee prison suicide case must establish each of the following three elements to establish a violation of due process: (1) the detainee had a "particular vulnerability to suicide," (2) the custodial officer or officers should have known of that vulnerability, and (3) those officers "acted with reckless indifference" to the detainee's particular vulnerability. 946 F.2d 1017, 1024 (3d Cir. 1991). Under the first prong, the plaintiff must show that there was a "strong likelihood, rather than a mere possibility, that self-inflicted harm will occur." *Id.* The second prong reflects the requirement that "[t]he strong likelihood of suicide must be so obvious that a lay person would easily recognize the necessity for preventative action; the risk of self-inflicted injury must not only be great, but also sufficiently apparent that a lay custodian's failure to appreciate it evidences an absence of any concern for the welfare of his or her charges." *Id.* at 1025. Finally, the third prong recognizes that there must be a necessary link between the prison official's knowledge and his disregard of the prisoner's particular risk. Although we have not developed the exact contours of the third prong, we have suggested that it is similar to the "deliberate indifference" standard applied to a claim brought under the Eighth Amendment, which requires the plaintiff to prove that the prison official "know[s] of and

7

disregard[s] an excessive risk to inmate health and safety." *Woloszyn*, 396 F.3d at 321

(quoting *Beers-Capitol v. Whetzel*, 256 F.3d 120 (3d Cir. 2001)).

In this case, the Estate asserts that the Defendants would have uncovered

Schuenemann's particular vulnerability to commit suicide had there been in place a policy

of screening inmates upon return from all court appearances.[5] The District Court rejected

that argument, and, based upon the evidence of record, determined that the Estate was

unable to prove that Schuenemann had a particular vulnerability to suicide. We agree

with that conclusion. By our count, ten witnesses, including Schuenemann's closest

family members, observed him either at his detention hearing or over the course of the

three days that he was detained at the ACJ. None of those individuals claimed that

Schuenemann was acting abnormally or that he gave any indication that he was going to

inflict harm upon himself. In addition, Schuenemann's parents and his sister testified in

[5]We note that the *Colburn* framework has been applied exclusively to claims against prison officials acting in their individual capacities, and our independent research did not disclose the framework's extension to claims against municipal defendants. *See Woloszyn*, 396 F.3d at 322-24; *Colburn II*, 946 F.2d at 1025-27; *Williams v. Borough of West Chester*, 891 F.2d 458, 465-67 (3d Cir. 1989); *Freedman v. City of Allentown*, 853 F.2d 1111, 1115-16 (3d Cir. 1988); *Colburn I*, 838 F.2d at 670-71. As noted *supra*, the defendants in this case are all municipal government entities. Thus, in order to advance a *Colburn* claim against the municipal defendants, the Estate must establish that the proposed screening policy would have put custodial officials on notice of Schuenemann's propensity to commit suicide, and that the failure to adopt such a policy constituted deliberate indifference. We therefore read the Estate's argument that Defendants failed to adopt adequate mental health screening measures as a component of the Estate's *Colburn* claim.

their depositions that Schuenemann did not behave irregularly when they spoke with him during his period of incarceration prior to being transferred to the ACJ.

In arguing that the District Court erred in its conclusion, the Estate relies principally on the lack of a mental health screening procedure for all inmates returning from court appearances to the ACJ. Dr. Dixon, Chairman of the Board at ACHS, testified in his deposition that incarcerated persons younger than 26 years of age, who have been imprisoned for the first time and who have been denied bond, face a statistically heightened risk of suicide. The Estate asks us to extrapolate from that statistical testimony about risks to a certain class of inmates to the conclusion that there was a "strong likelihood" that Schuenemann would commit suicide. We decline to do so because we agree with the District Court's thorough examination of this issue. Particularly persuasive is the District Court's conclusion that the Estate failed to present any evidence that an additional screening method would have aided this specific defendant, especially where those individuals who knew Schuenemann best have said that Schuenemann gave no indication that he wished to harm himself. *See Colburn II*, 946 F.2d at 1026 (commenting that similar evidence seeking to establish that heavy intoxication is a "serious red flag" of predisposition to commit a jailhouse suicide was insufficient to establish a particular vulnerability to suicide). The *Colburn* test is

detainee-specific, and in this case the Estate failed to submit sufficient evidence to create an issue of fact that there was a "strong likelihood" Schuenemann would commit suicide.[6]

## B.

The Estate also argues that Defendants violated Schuenemann's due process rights by failing to train its officers to identify and prevent suicides. The United States Supreme Court has recognized that municipal liability may be premised on a municipality's failure to train its employees if the municipality had a policy or custom of failing to train its employees and that the failure to train constitutes "deliberate indifference." *City of Canton v. Harris*, 489 U.S. 378, 388-389 (1989) ("Only where a municipality's failure to train its employee in a relevant respect evidences a 'deliberate indifference' to the rights of its inhabitants can such a shortcoming be properly thought of as a city 'policy or custom' that is actionable under § 1983."). The identified training deficiency must be "closely related" to the ultimate injury, i.e., the plaintiff "must . . . prove that the deficiency in training actually caused the deliberate indifference of municipal officers."

---

[6]Contrary to the Estate's assertion, the District Court did not engage in impermissible fact finding in reaching its conclusion that the Estate did not meet the first prong of the *Colburn II* test. The District Court did not determine that Schuenemann did not have a particular vulnerability to suicide, but rather that the Estate failed to submit sufficient evidence to create a material question of fact on that issue. In addition, the Estate's contention that the District Court erred by failing to address the remaining two prongs after deciding that Schuenemann did not have a particular vulnerability to suicide is unavailing in light of the fact that we ended our inquiry in *Colburn II* and *Woloszyn* after finding that the plaintiff in each of those cases failed to establish the first prong.

10

*Id.* at 391.  We have specifically expounded upon this causal requirement of failure-to-

train cases in the prison suicide context:

> A § 1983 plaintiff pressing a claim of this kind must identify a failure to provide specific training that has a causal nexus with his or her injury and must demonstrate that the failure to provide that specific training can reasonably be said to reflect a deliberate indifference to whether constitutional deprivations of the kind alleged occur.  In a prison suicide case, this means that the plaintiff must (1) identify specific training not provided that could reasonably be expected to prevent the suicide that occurred, and (2) must demonstrate that the risk reduction associated with the proposed training is so great and so obvious that the failure of those responsible for the content of the training program to provide it can reasonably be attributed to a deliberate indifference to whether the detainees succeed in taking their lives.

*Colburn II*, 946 F.2d at 1030.

The Estate does not contest the evidence in the record that Defendants had a policy

of conducting a physical and mental health screening of all incoming inmates to the ACJ,

including a suicide prevention screening.  ACHS's policy regarding suicide prevention

was in compliance with the standards set forth by the National Commission on

Correctional Healthcare ("NCCHC"), the national governing body responsible for

overseeing the delivery of prison health care and for accrediting the ACJ on an annual

basis.  That policy provided that all newly-arriving inmates would be screened for, *inter*

*alia*, suicide risks, and that all correctional and health care staff would be trained

regarding suicide prevention.  The undisputed record further reveals that all corrections

11

officers and case workers employed at the ACJ received annual suicide prevention training in the manner recommended by the NCCHC.[7]

In an attempt to demonstrate that there were flaws in Defendants' suicide prevention training program, the Estate points to the deposition testimony of Nurse Thompson and Major James Donis, the shift commander at the ACJ. Both prison employees testified at their depositions that they were unaware that age, attendance at a court hearing, and first-time incarceration are factors relevant to whether an inmate is prone to commit suicide. As *Colburn II* instructs, however, simply recognizing that prison officials are unaware that a certain class of individuals may be more likely to commit suicide is insufficient to establish a failure-to-train claim; rather, the Estate must identify specific training measures that could have prevented the particular harm at issue in this case. *Colburn II*, 946 F.2d at 1030 (finding that the plaintiff failed "to identify specific training measures that could reasonably have been expected to cause [the decedent's] custodians to recognize in her intoxication . . . that she was suicidal").

The Estate argues in this case that prison employees should have been instructed that such tendencies render an individual more likely to commit suicide, and that inmates such as Schuenemann should receive a mental health screening after returning from all

---

[7]By not responding to each numbered paragraph of Defendants' statements of fact, the Estate failed to comply with W.D. Pa. R. 56.1.C, E. As a result, the District Court properly deemed those facts as undisputed for purposes of deciding the motion for summary judgment. *See Anchorage Assocs. v. Virgin Islands Bd. of Tax Review*, 922 F.2d 168, 175-76 & n.7 (3d Cir. 1990).

12

court appearances.[8] The Estate's argument, however, suffers from a fundamental defect: assuming that Thompson, Donis, and other prison employees should have been educated that certain inmates, such as Schuenemann, were at a statistically greater risk of committing suicide, there is no evidence that such training and additional screening would have "single[d] [Schuenemann] out as particularly vulnerable to suicide." *Id.* The evidence reveals that none of the individuals who witnessed Schuenemann both during and after the hearing believed that he was acting abnormally. In fact, Schuenemann was interviewed on the morning of his death by a caseworker at the ACJ who had received annual training in suicide prevention. After observing Schuenemann's demeanor and his direct responses to questions, the caseworker concluded that Schuenemann was not suicidal.

Based upon the record before us, the Estate has not produced any evidence that a subsequent re-screening would have detected any suicidal tendencies in Schuenemann or that his death would have been avoided had prison employees received proper training. *See City of Canton*, 489 U.S. at 391. As a result, we agree with the District Court's well-

---

[8]We will accept for purposes of this opinion, as the District Court and the parties have apparently done, that re-screening inmates would constitute a specific training measure, as opposed to a failure to adopt a particular policy. We are reminded, however, of our pronouncement in *Colburn II* that "[w]hen evaluating the magnitude and obviousness of the risk involved, the relevant risk is not the suicide risk in the absence of a prevention program but the additional reduction in suicide risks that would have been occasioned by the addition of the proposed training program." *Colburn II*, 946 F.2d at 1030.

reasoned conclusion that the risk reduction associated with the Estate's proposed training was not "so great and so obvious" that the alleged failure to train can be attributed to deliberate indifference that resulted in Schuenemann's ultimate suicide.[9]

IV.

For the reasons set forth above, we conclude that the District Court did not err in adopting the Report and Recommendation of the Magistrate Judge and granting summary

---

[9]As the District Court correctly points out, there had not been any suicides at the ACJ since ACHS had assumed responsibility for the prison's health care services. Thus, Defendants would not have been on notice that there were any deficiencies in their suicide prevention policy, still less that the policy was deficient specifically as applied to young inmates who had just returned from unfavorable court appearances. As the Supreme Court has instructed us, we have to presume that Defendants took the historical backdrop into account as part of their rational decisionmaking process in concluding that the current suicide prevention policy was adequate. *See Collins*, 503 U.S. at 128-29 (noting that there is a "presumption that the administration of government programs is based on a rational decisionmaking process that takes account of competing social, political, and economic forces").

Furthermore, the District Court also correctly notes that the only evidence in the record regarding the communication of the recommendation to re-screen inmates was Dixon's deposition testimony, in which he testified that he believed another ACHS official relayed the recommendation to the lieutenant in charge of the intake area and to Major Donis. Neither of those individuals were policymakers, however, and there is no evidence in the record that the recommendation was ever relayed to the Allegheny County Jail Oversight Board or the Warden, the two identified policymakers responsible for the operation of the prison under state law. *See* 16 Pa. Stat. Ann. § 6004-A (establishing that the Allegheny County Jail Oversight Board is responsible for the "operation and maintenance of the prison, oversight of the health and safekeeping of inmates and the confirmation of the chief executive's selection of a warden"); *id.* § 6006-A, 61 Pa. Stat. Ann. § 409, *Jerry v. Francisco*, 632 F.2d 252, 256 (3d Cir. 1980) (Adams, J., concurring) (noting that, under 61 P.S. § 409, "the warden is charged with taking care of the prisoners in a jail that is under his supervision, and he is also responsible for the daily operation of the facility").

14

judgment in favor of Defendants.  Accordingly, we will affirm the judgment of the District Court.