**PRECEDENTIAL**


UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 16-2726
_____

RENEE PALAKOVIC, as Administrator of the Estate of
Brandon Palakovic;
DARIAN PALAKOVIC, as Administrator of the Estate
of Brandon Palakovic,

                                        Appellants


v.


JOHN WETZEL; KENNETH CAMERON;
JAMIE BOYLES; JAMEY LUTHER;
DR. JAMES HARRINGTON;
DR. DALEEP RATHORE; MICHELLE HOUSER;
MORRIS HOUSER; FRANCIS PIROZZOLA;
JOHN DOES #1, #2; JOHN DOES # 3-6;
MHM INC; DR. CAROL EIDSVOOG;
HEARING EXAMINER ROBERT REED;
CORRECTIONAL OFFICER KUSHNER;
SERGEANT DOUS

_____

On Appeal from the United States District Court
for the Western District of Pennsylvania
District Court No. 3-14-cv-00145
District Judge: Honorable Kim R. Gibson
_____

Argued January 12, 2017

Before: SMITH, *Chief Judge,* JORDAN, and
SHWARTZ, *Circuit Judges*

(Filed: April 14, 2017)

Bret Grote                        **[ARGUED]**
Abolitionist Law Center
P.O. Box 8654
Pittsburgh, PA  15221

Michael J. Healey
Healey & Hornack
247 Fort Pitt Boulevard
4th Floor
Pittsburgh, PA  15222

*Counsel for Appellants*

2

Howard G. Hopkirk                    **[ARGUED]**
Office of Attorney General of Pennsylvania
Strawberry Square
Harrisburg, PA  17120

      *Counsel for Corrections Officials Appellees*

Alan S. Baum
Cassidy L. Neal                    **[ARGUED]**
Matis Baum & O'Connor
444 Liberty Avenue
Suite 300, Four Gateway Center
Pittsburgh, PA  15222

      *Counsel for Appellees Dr. Daleep Rathore,*
      *Dr. Carol Eidsvoog, and MHM, Inc.*

Witold J. Walczak
American Civil Liberties Union
313 Atwood Street
Pittsburgh, PA  15213

      *Counsel for Amicus Appellants*

_____

OPINION
_____

SMITH, *Chief Judge.*

Brandon Palakovic, a mentally ill young man who was imprisoned at the State Correctional Institution at Cresson, Pennsylvania (SCI Cresson), committed suicide after repeatedly being placed in solitary confinement. His parents, Renee and Darian Palakovic, brought this civil rights action after their son's death. The District Court dismissed the family's Eighth Amendment claims against prison officials and medical personnel for failure to state a claim upon which relief can be granted. We write today to clarify and elaborate upon the legal principles that apply to Eighth Amendment claims arising out of prison suicides. For the reasons that follow, we will vacate the District Court's dismissals.

I.

The following allegations appear in the amended complaint.[1] Brandon Palakovic[2] was convicted of

---

[1] The allegations of the original complaint are consistent with the allegations of the amended complaint but provide fewer details. Where appropriate in our discussion of the specific claims raised in the original complaint, we have relied upon the allegations as set forth in the original, rather than the amended, complaint.

[2] For purposes of clarity, and intending no disrespect, we refer throughout this opinion to Brandon Palakovic by his

burglarizing an occupied structure in Perry County, Pennsylvania, and was sentenced by the state court to a term of 16–48 months' imprisonment. In April 2011, he arrived at the State Correctional Institution at Camp Hill, Pennsylvania (SCI Camp Hill), for processing and classification. Those procedures included a mental health screening.

Brandon informed SCI Camp Hill mental health staff that he had attempted suicide in the past and had engaged in self-harm as recently as August 2010. He also advised staff that he experienced periodic thoughts of self-harm and suicide, and that he had made plans about how to kill himself. Brandon was diagnosed with a number of serious mental disorders, including alcohol dependence, anti-social personality disorder, and impulse control disorder. He was identified as a "suicide behavior risk," J.A. 65[3], and was classified as "Stability Rating D," signifying "a substantial disturbance of thought or mood which significantly impairs judgment, behavior, capacity to recognize reality, or cope with the ordinary demands of life," J.A. 66. It is the lowest stability rating given a prisoner in the Pennsylvania Department of Corrections (DOC) system. He was, accordingly, placed on the prison mental health roster.

first name and to his parents, the plaintiffs, as the Palakovics.

[3] "J.A." refers to the parties' Joint Appendix.

Brandon was transferred to SCI Cresson in June 2011. During his incarceration at SCI Cresson, he reported feeling depressed, exhibited signs of depression, and acknowledged suicidal thoughts and a wish to die. His nickname within the prison became "Suicide." Yet no comprehensive suicide risk assessment was performed. Brandon did not receive psychological counseling, drug and alcohol counseling, group therapy, or interviews in clinically appropriate settings; any mental health interviews were conducted "through the cell door slot in the solitary confinement unit." J.A. 82.

According to the amended complaint, mental healthcare at SCI Cresson was seriously deficient in many respects. Specifically, the amended complaint alleged that SCI Cresson had insufficient psychiatric staff, failed to ensure adequate frequency of mental health appointments, failed to provide proper oversight of medication regimes, kept poor medical records, and did not train staff on the proper response to prisoners with mental illness. In addition, it was allegedly the practice at SCI Cresson that medications to treat mental illness were inadequately monitored for effectiveness and were used as a substitute for other, more effective treatments.

The amended complaint further alleged that SCI Cresson's practice for dealing with mentally ill prisoners like Brandon was to relegate them to solitary confinement. This meant that because of Brandon's particular mental illnesses and lack of proper treatment,

6

his behavior was "going to continually land him in solitary confinement unless there was an intervention on his behalf." J.A. 85. Therefore, over the course of his thirteen months at SCI Cresson, Brandon "was repeatedly subjected to solitary confinement via placement in the prison's Restricted Housing Unit (RHU), characterized by extreme deprivations of social interaction and environmental stimulation, abusive staff, and inadequate to non-existent mental health care."[4] J.A. 68 (footnote omitted).

During his "multiple 30-day stints in solitary confinement," J.A. 69, Brandon was exposed to extreme and trying conditions. He was isolated for approximately 23 to 24 hours each day, in a tiny cement cell of less than 100 square feet with only small slit windows affording him minimal outside visibility. He was not permitted to make phone calls, his possessions were limited to one small box, and his social interaction and environmental stimulation were severely reduced. Brandon was permitted just one hour of exercise five days out of each week, which took place in an outdoor cage only slightly larger than his cell.

---

[4] Neither the original complaint nor the amended complaint specifies the amount of time Brandon spent in solitary confinement during his 13-month incarceration at SCI Cresson, describing his stays there as "numerous," "repeated," and "multiple." *See*, *e.g.*, J.A. 69.

According to the amended complaint, prison officials were aware that exposure to these conditions carried mental health risks. The majority of incidents of self-harm at SCI Cresson—including suicides and suicide attempts—took place in solitary confinement. In 2011, 14 of the 17 documented suicide attempts (more than 80%) occurred in the prison's solitary confinement units. There also were "dozens of incidents" in which prisoners on the mental health roster engaged in self-harm, "while just two such incidents occurred in the general population." J.A. 78–79.

Notably, during Brandon's incarceration, the United States Department of Justice (DOJ) announced that it would be undertaking an investigation into "allegations that SCI Cresson provided inadequate mental health care to prisoners who have mental illness, failed to adequately protect such prisoners from harm, and subjected them to excessively prolonged periods of isolation, in violation of the Eighth Amendment to the U.S. Constitution." J.A. 77. As part of that investigation, the DOJ conducted a site visit from March 19 to 22, 2012—also while Brandon was incarcerated—during which it interviewed administrative staff, medical staff, and prisoners. That investigation, as described in a report issued on May 31, 2013 (the "DOJ Report"), revealed "a wide array of policies and practices that were responsible for systemic deficiencies in SCI Cresson's treatment of mentally ill and intellectually disabled

8

prisoners." J.A. 79; Department of Justice May 31, 2013 Findings Letter, https:// www.justice.gov/sites/ default/files/crt/legacy/2013/06/03/cresson_findings_5-31-13.pdf (last visited April 4, 2017).

Among other things, the DOJ reported a "system-wide failure of security staff to consider mental health issues appropriately," a "fragmented and ineffective" mental healthcare program, insufficient mental healthcare staffing to meet the prison population's needs, "[p]oor screening and diagnostic procedures," poor recordkeeping "contributing to a dysfunctional system that undermined continuity of care," "[d]eficient oversight mechanisms, including the failure to collect necessary information on critical incidents, such as acts of self-harm," and a lack of training in the proper response to warning signs by prisoners with serious mental illness. J.A. 79–80 (citing DOJ Report). Although Brandon was incarcerated at SCI Cresson while the DOJ conducted its investigation, he died before it issued its Report.

Brandon committed suicide on July 16, 2012, while in solitary confinement. He was 23 years old.

II.

As executors of their son's estate, Brandon's parents filed a five-count civil rights complaint on July 9, 2014 in the United States District Court for the Western

9

District of Pennsylvania, naming a number of prison officials and mental healthcare providers.[5] In that complaint, the Palakovics presented claims under the Eighth Amendment that all defendants had been deliberately indifferent to both inhumane conditions that Brandon experienced while in solitary confinement and to Brandon's serious medical need for mental healthcare.[6] The defendants filed motions under Rule

---

[5] Specifically, the original complaint named John Wetzel (Secretary of the Pennsylvania DOC), Kenneth Cameron (SCI Cresson's Superintendent), Jamie Boyles (SCI Cresson's Deputy Superintendent for Facilities Management), Jamey Luther (SCI Cresson's Deputy Superintendent for Centralized Services), Dr. James Harrington (SCI Cresson's Chief Psychologist), Dr. Daleep Rathore (MHM employee and head of psychiatric care at SCI Cresson), Michelle Houser (Unit Manager in SCI Cresson's Secure Special Needs Unit and Special Needs Unit), Morris Houser (Manager of SCI Cresson's Mental Health Unit), Francis Pirozzola (SCI Cresson's Security Captain), Shawn Kephart (Pennsylvania DOC's Director of the Treatment Services Bureau), MHM (the company under contract with the Pennsylvania DOC to provide mental healthcare services at SCI Cresson), and six John Doe defendants.

[6] The constitutional claims initially were brought pursuant to the Eighth and Fourteenth Amendments, but

12(b)(6) of the Federal Rules of Civil Procedure to dismiss the complaint for failure to state a claim upon which relief can be granted.

On June 26, 2015, the District Court entered a memorandum opinion and order granting the motions to dismiss. Rejecting the Palakovics' arguments to the contrary, the District Court concluded that, because the case involved a prison suicide, the "vulnerability to suicide" legal framework applied and required the Palakovics to establish that: "(1) the detainee had a 'particular vulnerability to suicide,' (2) the custodial officer or officers knew or should have known of that vulnerability, and (3) those officers 'acted with reckless indifference' to the detainee's particular vulnerability."[7] *Palakovic v. Wetzel*, No. 3:14-cv-145, 2015 WL 3937499, at *4 (W.D. Pa. June 26, 2015) (First

later court filings clarified that the Palakovics were pursuing claims under the Eighth Amendment only. The Palakovics also presented an Americans with Disabilities Act claim and two state law claims; the resolution of those claims is not at issue in this appeal.

[7] Although the District Court declared that "even if the vulnerability to suicide standard were inapplicable to either of Plaintiffs' two Eighth Amendment claims, the result would be the same," First Dismissal, 2015 WL 3937499 at *4, it did not elaborate upon this statement.

11

Dismissal) (quoting *Colburn v. Upper Darby Township* (*Colburn II*), 946 F.2d 1017, 1023 (3d Cir. 1991)). Because they did not plead facts sufficient to satisfy the vulnerability to suicide framework, the District Court dismissed the claims with leave to amend.

On August 7, 2015, the Palakovics filed their amended complaint. They did not re-plead the claims set forth in the original complaint and instead presented four vulnerability to suicide claims against four groups of defendants.[8] They also pled an Eighth Amendment "failure to train" claim against the supervisory officials.[9]

---

[8] Count I against SCI Cresson mental health personnel (Drs. Harrington, Rathore, and Eidsvoog; Dr. Eidsvoog had not been named in the original complaint); Count II against corrections officers (Reed, Kushner, Dous, Boyles, and Luther; Reed, Kushner, and Dous had not been named in the original complaint); Count III against supervisory officials (Wetzel, Cameron, Boyles, and Luther); and Count V against MHM.

[9] The amended complaint also set forth claims for medical neglect, discrimination on the basis of disability, wrongful death, and a survival action. The disposition of those claims is not relevant to this appeal. The amended complaint did not name several of the officials that had been named in the original complaint—specifically,

Two groups of defendants filed a second set of motions under Rule 12(b)(6) of the Federal Rules of Civil Procedure to dismiss the complaint for failure to state a claim upon which relief can be granted.[10] On February 22, 2016, the District Court granted the motions and dismissed the Eighth Amendment claims. *See Palakovic v. Wetzel*, No. 3:14-cv-145, 2016 WL 707486 (W.D. Pa. Feb. 22, 2016) (Second Dismissal). The District Court again granted leave to amend, but the Palakovics declined to file a second amended complaint. Instead, on April 15, 2016, they filed a motion to voluntarily withdraw the claims against the three remaining defendants (Kushner, Reed, and Dous) pursuant to Rule 41(a)(2) of the Federal Rules of Civil Procedure for the express purpose of filing this appeal. The District Court granted the motion, noting that the Palakovics had indicated an intention to stand on the amended complaint. The District Court entered judgment in favor of the defendants, and the Palakovics timely appealed.

---

Michelle Houser, Morris Houser, Francis Pirozolla, Shawn Kephart, and the six John Does.

[10] Defendants Dous, Reed, and Kushner were not served and did not file a motion to dismiss.

III.

A.

The District Court had jurisdiction pursuant to 28 U.S.C. §§ 1331, 1343, and 1367. We have jurisdiction to review a final order of the District Court under 28 U.S.C. § 1291. Although we generally do not exercise jurisdiction where a District Court dismisses a complaint without prejudice and grants leave to amend, *see Borelli v. City of Reading*, 532 F.2d 950, 951 (3d Cir. 1976), such an order is final and reviewable under § 1291 where, as here, a party declares an intention to stand on the complaint, *id.* at 952.[11]

---

[11] Rule 41(a)(1)(B) of the Federal Rules of Civil Procedure provides that a voluntary dismissal is without prejudice, unless the order states otherwise. Where a dismissal is without prejudice, the judgment may not be final and appealable under 28 U.S.C. § 1291. *See Borelli*, 532 F.2d at 951. Here, the voluntary dismissal order was silent as to whether the claims against Kushner, Reed, and Dous were dismissed with prejudice. At oral argument, however, counsel for the Palakovics clarified that the dismissal was with prejudice and that the Palakovics have abandoned all claims against Kushner, Reed, and Dous. This is sufficient to render the voluntary dismissal final for purposes of appeal.

## B.

We conduct a plenary review of an order granting a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6). *See Allen ex rel. Martin v. LaSalle Bank, N.A.*, 629 F.3d 364, 367 (3d Cir. 2011). The Rules of Civil Procedure demand that a plaintiff present "only 'a short and plain statement of the claim showing that the pleader is entitled to relief,' in order to 'give the defendant fair notice of what the . . . claim is and the grounds upon which it rests.'" *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)) (alteration in original). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citation and internal quotation marks omitted).

"A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.*; *see also Sheridan v. NGK Metals Corp.*, 609 F.3d 239, 262 n. 27 (3d Cir. 2010). To assess the sufficiency of a complaint under *Twombly* and *Iqbal*, a court must: "First, . . . 'tak[e] note of the elements a plaintiff must plead to state a claim.' Second, . . . identify allegations that, 'because they are no more than conclusions, are not entitled to the assumption of truth.' Finally, 'where there are well-pleaded factual

15

allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement for relief.'" *Burtch v. Milberg Factors, Inc.*, 662 F.3d 212, 221 (3d Cir. 2011) (internal quotation marks omitted) (quoting *Santiago v. Warminster Twp.*, 629 F.3d 121, 130 (3d Cir. 2010)).

## C.

The Palakovics seek to appeal the District Court's First Dismissal, although they did not re-plead their original conditions of confinement and serious medical need claims in the amended complaint. Nor did they express an intention to preserve those claims for appeal. As an initial matter, then, we must consider whether appellate review of the First Dismissal has been waived.

In general, an interlocutory order—like the First Dismissal order here—merges with the final judgment and is reviewable on appeal from the final judgment entered in the case. *See In re: Westinghouse Sec. Litig.*, 90 F.3d 696, 706 (3d Cir. 1996). Also in general, an amended pleading—like the amended complaint here—supersedes the earlier pleading and renders the original pleading a nullity. *See W. Run Student Hous. Assocs., LLC v. Huntington Nat'l Bank*, 712 F.3d 165, 171 (3d Cir. 2013); 6 Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1476 (3d ed. 2010). Obviously, there is considerable tension between these two principles as we consider the matter before us—a

16

tension that can be resolved only by deciding which principle prevails. Under the circumstances presented, we conclude that, while it would have been preferable for the Palakovics to have taken express, affirmative measures to ensure the preservation of their original claims for appellate review,[12] they have not waived those claims. We may therefore review the District Court's First Dismissal.

In *United States ex rel. Atkinson v. Pennsylvania Shipbuilding Co.*, we observed that "the proper rule allows plaintiffs to appeal dismissals despite amended pleadings that omit the dismissed claim *provided* repleading the particular cause of action would have been futile." 473 F.3d 506, 516 (3d Cir. 2007). We went on to explain that "[r]epleading is futile when the dismissal was 'on the merits.' A dismissal is on the merits when it is with prejudice *or based on some legal barrier other than want of specificity or particularity*." *Id.* (emphasis added). Thus, when a pleading "error" goes to the legal requirements of a cause of action, the dismissal is likely on the merits and should be reviewable on appeal. *Id.* at 517 n.17.

---

[12] The Palakovics could have more clearly preserved their original claims by "specifically refer[ring] to or adopt[ing]" them in the amended complaint. *W. Run. Student Hous. Assocs.,* 712 F.3d at 171.

17

Here, the District Court's First Dismissal states that the Eighth Amendment claims in the original complaint were dismissed for factual insufficiency. Yet that conclusion rested upon the District Court's application of the vulnerability to suicide framework. The Palakovics contend that application of that framework was legal error.

We conclude that the claims in the original complaint were dismissed on legal grounds, rather than due to a lack of factual specificity. *See id.* at 517. It is apparent that the District Court would not have been satisfied by a more detailed factual account to support the Palakovics' claims. Additional facts simply would not have addressed the legal flaw that provided the basis for dismissal—*i.e.*, the failure to plead allegations supporting a vulnerability to suicide claim. Because repleading would have been futile, the legal argument that the vulnerability to suicide framework never should have been applied is properly raised on appeal. Moreover, if there were any doubt, *Atkinson* directs that such doubt must be resolved in favor of the Palakovics and, thus, in favor of appellate review. *Id.* Accordingly, the Eighth Amendment claims as set forth in the original complaint have not been waived and we will consider whether the District Court properly dismissed them.[13]

---

[13] In contrast with theories dismissed by a legal ruling, parties voluntarily dropped from an amended complaint

18

IV.

Before turning to our review of the District Court's First Dismissal, it is necessary that we take a close look at the vulnerability to suicide framework that guided the District Court's decisionmaking process. Our vulnerability to suicide jurisprudence is set forth in three primary cases: *Colburn v. Upper Darby Township* (*Colburn I*), 838 F.2d 663 (3d Cir. 1988); *Colburn v. Upper Darby Township* (*Colburn II*), 946 F.2d 1017 (3d Cir. 1991); and *Woloszyn v. County of Lawrence*, 396 F.3d 314 (3d Cir. 2005). These cases addressed claims that prison officials violated the Constitution by failing to protect pre-trial detainees from harming themselves. We discuss each in turn.

---

do not remain in the case. *See Atkinson*, 473 F.3d at 518 ("It would be unjust under these circumstances to enable [plaintiff] to drag [a defendant] back into this case after [that defendant], by [plaintiff's] own decision, was dropped as a defendant."). Accordingly, the claims asserted against the four defendants named in the original complaint who were dropped from the amended complaint (Michelle Houser, Morris Houser, Francis Pirozzola, and Shawn Kephart) are waived and may not be challenged on appeal. We will not consider any claims in the original complaint as they applied to those four defendants.

In *Colburn I*, Melinda Lee Stierheim was arrested for public intoxication. *Colburn I*, 838 F.2d at 664. Four hours after her arrest, while in police custody, she died from a self-inflicted gunshot wound. *Id.* at 665. Sue Ann Colburn, Melinda's mother and administratrix of her estate, filed a § 1983 complaint against prison officials alleging, *inter alia*, that they violated Melinda's constitutional rights because they knew or should have known that Melinda was a suicide risk and therefore had an obligation to protect her against that risk. *Id.* The District Court granted the officials' motion to dismiss for failure to state a claim. *Id.*

We reversed.[14] We first examined cases holding that inmates who had been victims of violence by other inmates could bring claims under the Eighth Amendment against their custodians where those custodians deliberately or recklessly disregarded the risk to those inmates' safety. *Id.* at 667–68. We reasoned that such

---

[14] Because *Colburn I* was decided long before *Iqbal* and *Twombly*, we applied the standard of review then in effect: taking all well-pleaded allegations as true, we construed the complaint in a light most favorable to the plaintiff and determined whether there was a reasonable reading of the pleadings under which she may be entitled to relief. *Colburn I*, 838 F.2d at 665–66 (citing *Estate of Bailey by Oare v. County of York*, 768 F.2d 503, 506 (3d Cir. 1985)).

cases can be analogized to the scenario in which the acts causing the injury to the prisoner are those of the prisoner herself. *Id.* at 668. We further concluded that the fundamental protections afforded to prisoners under the Eighth Amendment, like personal security, are also afforded to pre-trial detainees. *Id.* Although the Eighth Amendment does not apply directly to pre-trial detainees, *see Fuentes v. Wagn*er, 206 F.3d 335, 341 (3d Cir. 2000), we concluded that the Due Process Clause of the Fourteenth Amendment provides pre-trial detainees at least as much protection for personal security as the level guaranteed to prisoners by the Eighth Amendment. *Colburn I*, 838 F.2d at 668.

We recognized that it would be inappropriate to place custodial officials in a position in which they must guarantee that an inmate will not commit suicide. *Id.* at 669. We decided, however, that this consideration should not preclude the possibility of a § 1983 cause of action:

> Of course we agree that custodial officials cannot be placed in the position of guaranteeing that inmates will not commit suicide. On the other hand, if such officials know or should know of the particular vulnerability to suicide of an inmate, then the Fourteenth Amendment imposes on them an obligation not to act with reckless indifference to that vulnerability.

21

*Id.* at 669. Because Colburn adequately alleged that the defendants in her case acted with such reckless indifference, we held that Colburn could—and did—state a § 1983 claim against prison officials for their failure to prevent Melinda's suicide. *Id.* at 670–71.

After remand and a period of discovery, the District Court granted summary judgment in the prison officials' favor. The matter then returned to this Court via a second appeal. *Colburn II*, 946 F.2d 1017.

In *Colburn II*, we recognized that "*Colburn I* established the standard of liability to be applied in this circuit in prison suicide cases." *Id.* at 1023. We explained that the vulnerability to suicide framework is simply a more specific application of the general rule set forth in *Estelle v. Gamble*, 429 U.S. 97, 104 (1976), which requires that prison officials not be deliberately indifferent to the serious medical needs of prisoners. In essence, a "particular vulnerability to suicide" is just one type of "serious medical need." *Colburn II*, 946 F.2d at 1023.

We then examined more closely what it means to have a "particular vulnerability to suicide." We observed that an individual's particular vulnerability to suicide "speaks to the degree of risk inherent in the detainee's condition." *Id.* at 1024. That degree of risk must be a "strong likelihood, rather than a mere possibility, that self-inflicted harm will occur." *Id.* (citations omitted).

22

We explained that a detainee's "strong likelihood" of suicide "must be 'so obvious that a lay person would easily recognize the necessity for' preventative action." *Id.* at 1025 (citing *Monmouth Cty. Corr. Inst. Inmates v. Lanzaro*, 834 F.2d 326, 347 (3d Cir. 1987)).

In addition to the particular vulnerability of the detainee, we also required a relatively high level of culpability on the part of prison officials before holding them accountable, *i.e.*, reckless or deliberate indifference to that "strong likelihood" of suicide. We declined to precisely define these terms, instead observing that liability may attach only where the officials' culpability is something beyond mere negligence. *Colburn II,* 946 F.2d at 1024–25. We noted other situations in which custodians had been found to "know" of a particular vulnerability to suicide—including, for example, where "they have had actual knowledge of an obviously serious suicide threat, a history of suicide attempts, or a psychiatric diagnosis identifying suicidal propensities." *Id.* at 1025 n.1.

Applying these principles in *Colburn II*, we determined that Colburn failed to establish a violation of Melinda's Fourteenth Amendment right to Due Process based upon prison officials' deliberate indifference to her particular vulnerability to suicide. Viewing the developed record in the light most favorable to Colburn, a rational trier of fact could have concluded only that, upon her arrest, prison officials knew or should have

23

known that Melinda was intoxicated, had had an argument with her boyfriend, had tried to ingest three pills, had a bullet in her pocket, and had faint scars on her forearm. *Id.* at 1026–27. Given these facts, we upheld the District Court's determination that, as a matter of law, Melinda's particular vulnerability was not sufficiently obvious to hold the prison officials accountable for failing to prevent her suicide. *Id.* at 1027.

Finally, we revisited this framework in *Woloszyn v. County of Lawrence*, 396 F.3d 314 (3d Cir. 2005). In that case, Richard Lee Woloszyn was arrested for attempted burglary and was taken into police custody. *Id.* at 316. Several hours later, he was found hanging by his neck in his cell. *Id.* at 318. His estate filed a § 1983 action seeking to hold prison officials accountable for failing to prevent the suicide. *Id.* at 318–19. After discovery, the District Court granted summary judgment in favor of the prison officials. *Id.* at 319.

On appeal, we first considered the culpability element set forth in *Colburn I* and *Colburn II—i.e.*, that officials "knew or should have known" of a strong likelihood of suicide. As we did in the *Colburn* cases, we once again recognized that while Eighth Amendment standards do not directly control in pretrial detainee cases, the "deliberate indifference" standard that applies to officials under the Eighth Amendment probably is the "equivalent" to the "should have known" element in a vulnerability to suicide case involving a detainee.

24

*Woloszyn*, 396 F.3d at 321. To the extent the issue remained open, we opted not to conclusively resolve it because we determined that the developed record was devoid of evidence of Woloszyn's "particular vulnerability to suicide." *Id.* at 321–22.

Among other things, the record demonstrated that Woloszyn had been in good spirits and had specifically denied being suicidal. *Id.* at 322. While there was one witness who testified that Woloszyn had been remorseful and distant and had discussed both a recent drug and alcohol binge and his feelings of failure as a father, the court concluded that "such statements, without more, are [not] sufficient to create a genuine issue of material fact regarding knowledge of Woloszyn's vulnerability to suicide. They do not show that there was 'a strong likelihood, rather than a mere possibility, that self-inflicted harm will occur.'" *Id.* at 322–23. We therefore affirmed the District Court's grant of summary judgment in favor of the defendants.

\* \* \*

In sum, our case law teaches that, when a plaintiff seeks to hold a prison official liable for failing to prevent a detainee's suicide, a pre-trial detainee may bring a claim under the Due Process Clause of the Fourteenth Amendment that is essentially equivalent to the claim that a prisoner may bring under the Eighth Amendment. Thus, whether a pre-trial detainee or a convicted

prisoner, a plaintiff must show: (1) that the individual had a particular vulnerability to suicide, meaning that there was a "strong likelihood, rather than a mere possibility," that a suicide would be attempted; (2) that the prison official knew or should have known of the individual's particular vulnerability; and (3) that the official acted with reckless or deliberate indifference, meaning something beyond mere negligence, to the individual's particular vulnerability.[15] We must now consider the application of these principles, where appropriate, to Brandon Palakovic's circumstances.

V.

A.

Returning to the first constitutional claim presented in the original complaint, "Plaintiffs contend that Defendants were deliberately indifferent by placing [Brandon] in solitary confinement, given his mental health vulnerabilities, which deprived him of basic human needs of environmental stimulation, social

---

[15] In *Colburn II*, we did not precisely define the terms "deliberate indifference" or "reckless indifference," concluding that, whichever formulation is employed, it indicates a level of culpability beyond mere negligence. 946 F.2d at 1024. We once again do not find it necessary to parse these phrases to determine whether there is some distinction between them.

interaction, mental health, and physical health." First Dismissal, 2015 WL 3937499 at *4. Considering this claim, the District Court determined "that this case involves a prison suicide and that the 'vulnerability to suicide' standard used by courts in this Circuit applies to Plaintiffs' allegations." *Id.* It concluded that the original complaint failed to state a claim because it did not allege facts sufficient to satisfy any of the three prongs of a vulnerability to suicide claim.[16] *Id.* at *5–6.

---

[16] The District Court reasoned: "First, Plaintiffs have not alleged facts showing that [Brandon] had a particular vulnerability to suicide" because the complaint was "devoid of any factual allegations that there was a strong likelihood that self-inflicted harm would occur." First Dismissal, 2015 WL 3937499 at *5. Next, the District Court concluded that "Plaintiffs have not alleged facts showing that Defendants knew or should have known about [Brandon's] particular vulnerability to suicide." *Id.* The District Court observed, for example, that "nowhere do Plaintiffs allege that any of the Defendants had any knowledge of [Brandon's] history of suicide attempts or suicidal thoughts. There are no allegations in the complaint that [Brandon] attempted suicide while at the prison or made his suicidal thoughts or tendencies known to Defendants." *Id.* at *6. Finally, the District Court concluded that the complaint failed to allege facts

27

The Palakovics have consistently argued that this claim should *not* have been considered through the lens of the vulnerability to suicide framework. They sought to hold prison officials accountable for injuries that Brandon experienced during his periods of isolation in solitary confinement while he was alive, not to hold officials accountable (at least, not directly accountable) for failing to prevent his death. Their claim was independent of a particular vulnerability to suicide on Brandon's part.

To at least some degree, the District Court was persuaded to apply the vulnerability to suicide framework to the Palakovics' claims because of our language in *Colburn II* that "*Colburn I* established the standard of liability to be applied in this circuit in prison suicide cases." *Colburn II*, 946 F.2d at 1023. We clarify today that this statement indicates that the vulnerability to suicide framework applies when a plaintiff seeks to hold prison officials accountable for failing to prevent a prison suicide. It does not, however, preclude other types of claims, even if those claims also relate to an individual who committed suicide while in prison.

Here, to the extent Brandon could have brought an Eighth Amendment claim contesting his conditions of

showing that the defendants were deliberately indifferent to any vulnerability. *See id.*

28

confinement while he was alive, his family should not be precluded from doing so because he has passed away. We agree with the Palakovics that their original claim need not have to fit within the vulnerability to suicide framework, and the District Court erred in dismissing it solely for that reason.

## B.

A claim of inhumane prison conditions may rise to the level of an Eighth Amendment violation where the prison official "deprived the prisoner of the minimal civilized measure of life's necessities" and "acted with deliberate indifference in doing so, thereby exposing the inmate to a substantial risk of serious damage to [his] future health." *Parkell v. Danberg*, 833 F.3d 313, 335 (3d Cir. 2016) (quoting *Chavarriaga v. N.J. Dep't of Corr.*, 806 F. 3d 210, 226 (3d Cir. 2015)).

The original complaint alleged that several defendants were either responsible for Brandon's repeated placement in solitary confinement or indirectly responsible through policies and practices that led to his repeated confinement there.[17] For instance, the

---

[17] A supervisor may be directly liable under the deliberate indifference test set forth in *Farmer v. Brennan*, 511 U.S. 825 (1994), if the supervisor "knew or w[as] aware of and disregarded an excessive risk to the plaintiff['s] health or safety[.]" *Beers-Capitol v. Whetzel*, 256 F.3d

Palakovics alleged that supervisory officials Wetzel, Cameron, Boyles, Luther, and Harrington "all upheld policies and practices [at SCI Cresson] of sentencing prisoners to solitary confinement based on behavior that was caused by mental illness and intellectual disability." J.A. 18. In addition, Wetzel, Cameron, Boyles and Luther had responsibility for, among other things, disciplinary proceedings and punishment and policies pertaining to the use of solitary confinement. Finally, Boyles and Luther were members of the "Program Review Committee," which was directly responsible "for oversight of the RHU, including review of the appropriateness of placement in the RHU for individual prisoners." J.A. 25–26.

The next question, then, is whether those defendants with responsibility for Brandon's placement in solitary confinement were alleged to have sufficient

---

120, 135 (3d Cir. 2001). A plaintiff "can show this by establishing that the risk was obvious." *Id.* There is some question as to whether a supervisor may be held indirectly liable for deficient policies under *Sample v. Diecks*, 885 F.2d 1099, 1118 (3d Cir. 1989)), as the Supreme Court may have called the so-called *Sample* test into question in *Ashcroft v. Iqbal*, 556 U.S. 662 (2009). Because the Palakovics have plausibly alleged a claim based on direct supervisory liability, we need not consider the unresolved nature of the *Sample* test today.

knowledge that the conditions there were inhumane for him in light of his mental illness. Before we turn to the Palakovics' particular allegations, we first acknowledge the robust body of legal and scientific authority recognizing the devastating mental health consequences caused by long-term isolation in solitary confinement. In our recent decision, *Williams v. Secretary of the Pennsylvania Department of Corrections*, 848 F.3d 549 (3d Cir. 2017), we observed a growing consensus—with roots going back a century—that conditions like those to which Brandon repeatedly was subjected can cause severe and traumatic psychological damage, including anxiety, panic, paranoia, depression, post-traumatic stress disorder, psychosis, and even a disintegration of the basic sense of self identity.[18]  *Id.* at 566–67.  And the damage

---

[18] While *Williams* addressed Due Process claims brought by death row inmates, the conditions on death row there mirror in many respects those of the RHU as described in the Palakovics' amended complaint, including enclosure in a small windowless cement cell for the majority of each day, severely limited social contact, and little exercise or exposure to fresh air. *See Williams*, 848 F.3d at 554–55, 563.  In *Williams*, we determined that indefinite confinement in such conditions, when the initial justification for the confinement ceased to exist, caused an atypical and significant hardship relative to the ordinary incidents of prison life, thereby giving rise to a protected liberty interest. *Id.* at 561–64.

does not stop at mental harm: "Physical harm can also result. Studies have documented high rates of suicide and self-mutilation amongst inmates who have been subjected to solitary confinement. These behaviors are believed to be maladaptive mechanisms for dealing with the psychological suffering that comes from isolation." *Id.* at 567–68 (citations omitted). Against this backdrop of the extremely serious and potentially dire consequences of lengthy exposure to the conditions of solitary confinement, we turn to the sufficiency of the Palakovics' claim that prison officials who were aware of his history of mental illness permitted Brandon to be repeatedly exposed to inhumane conditions of confinement and acted with deliberate indifference in doing so.

The original complaint adequately alleged that the prison diagnosed Brandon with an array of serious mental health issues and placed him on a mental health roster, making it quite reasonable to infer that prison officials had (or should have had) knowledge of those diagnoses. The complaint further alleged that Wetzel and his subordinates were aware that the conditions of solitary confinement "cause severe psychological harm, exacerbate pre-existing mental health problems, and generated the majority of suicides, suicide attempts, and acts of self-harm at SCI Cresson and throughout the entire [Pennsylvania DOC]." J.A. 15. While perhaps a somewhat conclusory allegation on its own, this was

32

buttressed by allegations of the officials' specific awareness of suicides and instances of self-harm that had occurred just before Brandon's confinement, and was underscored by the Department of Justice's announced investigation, which it conducted for the express purpose of determining whether SCI Cresson routinely subjected mentally ill prisoners (like Brandon) to unnecessarily harmful conditions of confinement.

Considering these factual allegations in light of the increasingly obvious reality that extended stays in solitary confinement can cause serious damage to mental health, we view these allegations as more than sufficient to state a plausible claim that Brandon experienced inhumane conditions of confinement to which the prison officials—Wetzel, Cameron, Boyles, Luther, and Harrington—were deliberately indifferent.[19] We therefore conclude that the District Court should have allowed this claim to proceed to discovery.[20]

---

[19] In contrast, we have not identified any allegations that could plausibly establish that Dr. Rathore or MHM had any role in Brandon's placement in solitary confinement. Accordingly, the claim was properly dismissed as to these defendants.

[20] To the extent the Palakovics attempted to bring any Eighth Amendment claims against the prison officials in their official capacities, such claims were properly

33

C.

---

dismissed.  Official capacity claims are treated as brought against the State, which is not a "person" under § 1983. *Hafer v. Melo*, 502 U.S. 21, 26 (1991).  Claims under § 1983 may proceed only against the defendants in their individual capacities.  *See id*. at 31.

We next consider the Palakovics' claim that all defendants violated Brandon's constitutional rights by providing inadequate mental healthcare treatment.[21] In assessing the Palakovics' serious medical needs claim, the District Court first observed that "as explained above, the complaint has not alleged that [Brandon] had a particular vulnerability to suicide." First Dismissal, 2015 WL 3937499 at *8. The District Court went on to conclude that "the complaint does not allege facts showing that Defendants were deliberately indifferent to [Brandon's] serious medical needs related to his mental health treatment at the prison," *id.*, because he received *some* mental health care while at SCI Cresson: "[Brandon] was placed on the prison's mental health roster, he was prescribed medication, and he was visited by mental health staff," *id.* at *9.[22] We disagree with both conclusions. Neither the failure to plead a particular vulnerability to suicide nor the acknowledgment that

---

[21] Specifically, the named defendants were prison officials Wetzel, Cameron, Boyles, Luther, and Harrington and medical providers Rathore and MHM.

[22] While Brandon's placement on the mental health roster appears to signify that he required mental health treatment, we see no basis for a conclusion that placement on the prison mental health roster alone is a form of treatment.

35

Brandon received some mental healthcare during his incarceration precludes this claim.

The Eighth Amendment prohibits prison officials from being deliberately indifferent to an inmate's serious medical needs.[23] *Estelle v. Gamble*, 429 U.S. 97, 104 (1976). "To act with deliberate indifference to serious medical needs is to recklessly disregard a substantial risk of serious harm." *Giles v. Kearney*, 571 F.3d 318, 330 (3d Cir. 2009). While we have recognized that a particular vulnerability to suicide qualifies as a serious medical need, *see Colburn II*, 946 F.2d at 1023, a vulnerability to suicide is not the sole need on which the Palakovics' claim was focused. Rather, the Palakovics sought to hold prison officials and mental healthcare staff accountable for failing to meet Brandon's serious need for mental healthcare.

As masters of their complaint, the Palakovics wished to bring this claim without regard to Brandon's particular vulnerability (or lack thereof) to suicide, and

---

[23] A medical need is serious where it "has been diagnosed by a physician as requiring treatment" or is "so obvious that a lay person would easily recognize the necessity" of medical attention. *Monmouth Cty. Corr. Inst. Inmates*, 834 F.2d at 347. It is undisputed that the allegations of the complaint demonstrated that Brandon Palakovic had a serious need for mental healthcare treatment.

instead wished to pursue a more general claim under *Estelle* that the SCI Cresson officials were deliberately indifferent to Brandon's serious need for adequate mental healthcare and that this indifference led to injury in the form of deterioration of Brandon's condition ultimately leading to his suicide. In other words, they were, once again, *not* attempting to directly claim that the prison officials should be held liable for failing to prevent Brandon's suicide.

Where a prisoner has received some amount of medical treatment, it is difficult to establish deliberate indifference, because prison officials are afforded considerable latitude in the diagnosis and treatment of prisoners. *See Durmer v. O'Carroll*, 991 F.2d 64, 67 (3d Cir. 1993). Allegations of mere negligent treatment or even medical malpractice do not trigger the protections of the Eighth Amendment. *Estelle*, 429 U.S. at 105–06. "Where a prisoner has received some medical attention and the dispute is over the adequacy of the treatment, federal courts are generally reluctant to second guess medical judgments and to constitutionalize claims which sound in state tort law." *United States ex rel. Walker v. Fayette County*, 599 F.2d 573, 575 n.2 (3d Cir. 1979) (internal quotations and citation omitted). Deference is given to prison medical authorities in the diagnosis and treatment of patients, and courts "disavow any attempt to second-guess the propriety or adequacy of a particular course of treatment . . . [which] remains a question of

sound professional judgment." *Inmates of Allegheny Cty. Jail v. Pierce*, 612 F.2d 754, 762 (3d Cir. 1979) (quoting *Bowring v. Godwin*, 551 F.2d 44, 48 (4th Cir. 1977)) (alterations in original).

Nonetheless, there are circumstances in which some care is provided yet it is insufficient to satisfy constitutional requirements. For instance, prison officials may not, with deliberate indifference to the serious medical needs of the inmate, opt for "an easier and less efficacious treatment" of the inmate's condition. *West v. Keve*, 571 F.2d 158, 162 (3d Cir. 1978) (quoting *Williams v. Vincent*, 508 F.2d 541, 544 (2d Cir. 1974)). Nor may "prison authorities deny reasonable requests for medical treatment . . . [when] such denial exposes the inmate 'to undue suffering or the threat of tangible residual injury.'" *Monmouth County Corr. Inst. Inmates*, 834 F.2d at 346 (quoting *Westlake v. Lucas*, 537 F.2d 857, 860 (6th Cir. 1976)). And, "knowledge of the need for medical care [may not be accompanied by the] . . . intentional refusal to provide that care." *Id.* (alterations in original) (quoting *Ancata v. Prison Health Servs.*, 769 F.2d 700, 704 (11th Cir. 1985)).

Brandon Palakovic suffered from serious mental healthcare issues: He had informed prison mental health staff of prior suicide attempts and self-injury; he had been diagnosed with a number of serious mental disorders; and the prison labeled him "Stability Rating D" and placed him on the prison mental health roster.

And SCI Cresson personnel did treat Brandon's mental illness while he was an inmate. Specifically, according to the original complaint, Brandon was prescribed antidepressant medication and was visited by psychology staff on three occasions.

The Palakovics claim that, despite this minimal treatment, the defendants intentionally or recklessly provided Brandon with mental healthcare that was so grossly deficient that it violated the Constitution. They alleged, for instance, that Brandon requested counseling from a psychiatrist, but his request was ignored and a psychiatrist did not provide treatment. They further alleged that medical staff refused to provide Brandon with necessary forms of treatment and instead relied only on medication—but then neglected to ever evaluate the efficacy of the medication, even after Brandon himself advised staff that the medications were not effective.

More broadly, according to the Palakovics, Dr. Harrington—chief psychologist at SCI Cresson and the individual with responsibility for mental health services throughout the prison—expressly prohibited medical personnel from speaking with mentally ill prisoners in solitary confinement "for more than 1–2 minutes at a time through solid steel doors." J.A. 27. They further alleged that SCI Cresson had "systemic deficiencies" in mental healthcare treatment, and failed "to adhere to the minimal components of a constitutional prison mental health care system"—conclusions that the DOJ reached

in its investigation. J.A. 20–21. These systemic deficiencies included punishing the mentally ill rather than treating them, a fragmented mental healthcare program with insufficient staffing and poor diagnostic procedures, and a failure to have any program to identify, treat, or supervise prisoners at risk for suicide. According to the Palakovics, "SCI Cresson's lack of a systematic program for screening and evaluating prisoners in need of mental health care caused officials to understate, delay, and ignore Brandon Palakovic's need for mental health care during his confinement." J.A. 22.

And there is a final, key component to the Palakovics' claim, which takes it from the realm of mere negligence to a potential claim of constitutional magnitude: the defendants permitted Brandon—with his fragile mental health condition and history of self-harm and suicide attempts—to be repeatedly subjected to the harsh and unforgiving confines of solitary confinement. Allegedly ignoring the prison's express written policy, which acknowledges that placement of mentally ill prisoners in solitary confinement can increase the potential for suicide due to the "inherent stress" of those conditions, the defendants nonetheless "substituted solitary confinement for treatment."[24] J.A. 22. Thus, the

_____

[24] The supervisory defendants (Wetzel, Cameron, Luther Boyles, and Harrington) are not alleged to have been personally responsible for Brandon's mental healthcare

40

defendants are alleged to have affirmatively contributed to causing Brandon's serious mental health conditions to deteriorate. J.A. 16 ("Although Brandon had a 'history of self-harm and suicide attempts, he continued to be placed in isolation, eventually leading to his death.'" (quoting DOJ Report)).

Considering these allegations and recognizing the high bar the Palakovics must meet in order to ultimately prevail, we conclude that they have presented allegations

---

treatment. Nevertheless, the Palakovics adequately alleged that the supervisory defendants were directly responsible for the allegedly unreasonable and dangerous practice at SCI Cresson of substituting solitary confinement for mental healthcare treatment, and that those supervisors knew such placement in solitary confinement could increase the risk of suicide. The Palakovics further alleged that, despite that knowledge and the obviousness of the risk, the supervisory defendants did nothing. Therefore, the Palakovics presented a plausible claim of direct supervisory liability sufficient to survive a motion to dismiss. *See Beers-Capitol*, 256 F.3d at 135 ("to make out a claim of deliberate indifference based on direct liability" plaintiffs must allege "that the defendants knew or were aware of and disregarded an excessive risk to the plaintiffs' health or safety").

sufficient to state a plausible claim warranting discovery: Despite receiving some minimal care, Brandon received mental health treatment while at SCI Cresson that fell below constitutionally adequate standards, and the defendants—both the mental healthcare personnel providing treatment and the supervisory officials and medical corporation responsible for the prison's mental healthcare treatment policies—were deliberately indifferent to Brandon's serious medical needs. Thus, this claim, too, should have survived dismissal.

## VI.

After the District Court's First Dismissal made clear that their claims would not proceed beyond the pleading stage if those claims did not include allegations meeting the vulnerability to suicide framework, the Palakovics amended their complaint to set forth four vulnerability to suicide claims and a failure to train claim. The District Court dismissed those claims as well.

## A.

### 1.

The amended complaint alleged that Brandon disclosed to prison personnel his history of suicide attempts, including an attempt in the recent past, his periodic thoughts of both self-harm and suicide, and even that he had made specific plans about how he would go

42

about killing himself. He had been diagnosed with an array of serious mental illnesses, exhibited signs of depression, shared his suicidal thoughts with prison staff, and expressed a wish to die. Unsurprisingly, after the prison considered these indications, it labeled him a "suicide behavior risk." J.A. 65. Despite these allegations, the District Court concluded that the amended complaint was insufficient to "establish a strong likelihood that Palakovic would inflict self-harm." Second Dismissal, 2016 WL 707486 at *6. We cannot agree.

When a mentally ill, depressed person has attempted to kill himself multiple times, has engaged in self-harm, declares he has been thinking about killing and harming himself, and has made an actual plan of how he would carry out his own suicide, it cannot be said as a matter of law that the risk of suicide is nothing more than a "mere possibility." *Woloszyn*, 396 F.3d at 322 (quoting *Colburn II*, 946 F.2d at 1024). Brandon's suicidal propensities were so readily apparent that his fellow inmates nicknamed him "Suicide." J.A. 69; *see Colburn II*, 946 F.2d at 1025 (there is a "strong likelihood" where a lay person would recognize the necessity for preventive action). If we were to conclude that Brandon's circumstances were insufficient to allege a "particular vulnerability to suicide," it is difficult to imagine how any plaintiff could ever succeed in doing so.

43

Our statements in *Woloszyn* and *Colburn II* requiring a plaintiff to demonstrate a "strong likelihood" of self-harm were never intended to demand a heightened showing at the pleading stage by demonstrating—as the District Court seemed to require here—that the plaintiff's suicide was temporally imminent or somehow clinically inevitable.   A particular individual's vulnerability to suicide  must be assessed based on the totality of the facts presented.   In our view, the sum of the facts alleged in the amended complaint are more than sufficient to support plausible inferences that there was a "strong likelihood" that self-inflicted harm would occur, and that Brandon therefore suffered from a particular vulnerability to suicide.

2.

The District Court also determined that the amended complaint did not allege facts "showing that Defendants knew or should have known about [Brandon's] particular vulnerability to suicide" because the Palakovics "only generally allege that Defendants 'were aware of' or 'were familiar with' [Brandon's] medical history, vulnerability to suicide, and his nickname of 'Suicide.'"   Second Dismissal, 2016 WL 707486 at *6.  We do not read the amended complaint so narrowly.

The Palakovics plausibly alleged that defendants Harrington, Rathore, Eidsvoog, Boyles, and Luther all

44

knew of Brandon's particular vulnerability to suicide, or if they did not actually know, at least should have known. We have observed that prison officials "know" of a particular vulnerability to suicide where they have had actual knowledge of a history of suicide attempts or a diagnosis identifying suicidal propensities. *See Colburn II*, 946 F.2d at 1025 n.1. Brandon had attempted suicide on prior occasions and told prison officials so. The prison identified Brandon as a "suicide behavior risk" and rated him "Stability Rating D," diagnosed him with multiple, serious mental illnesses known to heighten the risk of self-harm, and placed him on the "mental health roster." The Palakovics allege that all of this information was set forth in Brandon's records, which the corrections officers and medical staff must have—or, at the very least, should have—reviewed when considering both his treatment and whether or not to repeatedly place him in solitary confinement. These facts, taken together, are sufficient to support a reasonable inference that prison officials and medical personnel knew or should have known of Brandon's particular vulnerability to suicide.

3.

Finally, the District Court concluded that the amended complaint failed to adequately plead deliberate indifference on the part of any defendant. In so doing, the District Court erroneously applied a subjective test, examining what the officials "were actually aware of as opposed to what they should have been aware of."

45

Second Dismissal, 2016 WL 707486 at *7. Yet our case law is clear: It is not necessary for the custodian to have a subjective appreciation of the detainee's particular vulnerability. *Woloszyn*, 396 F.3d at 320 (quoting *Colburn II*, 946 F.2d at 1024–25). Rather, we have held that "reckless or deliberate indifference to that risk" only demands "something more culpable on the part of the officials than a negligent failure to recognize the high risk of suicide." *Id*. (citation omitted).

After applying the incorrect standard, the District Court then unnecessarily required the Palakovics to demonstrate one of three limited factual circumstances—specifically, where: (1) a defendant took affirmative action directly leading to the suicide; (2) a defendant actually knew of the suicidal tendencies of a particular prisoner and ignored the responsibility to take reasonable precautions; or (3) a defendant failed to take "necessary and available precautions to protect the prisoner from self-inflicted wounds." Second Dismissal, 2016 WL 707486 at *7 (citing *Freedman v. City of Allentown*, 853 F.2d 1111, 1115–16 (3d Cir. 1988)). The District Court observed, "Plaintiffs have failed to allege facts showing any of these scenarios." *Id.*

While these factual scenarios provide helpful guidance in determining whether a case meets the vulnerability to suicide standard, each case will present unique circumstances and should be considered on its own facts. A failure to track the precise contours of our

prior caselaw should not, by itself, compel a conclusion that a plaintiff has failed to state a vulnerability to suicide claim. Here, in our assessment, the Palakovics adequately alleged that the defendants knew of both Brandon's particular vulnerability to suicide and his mental health care needs, but—in disregard of that knowledge—repeatedly placed him (or permitted his placement) in solitary confinement, where they knew that the risk of suicide and mental harm was even greater. This claim is amply supported by specific factual allegations.

First, as addressed in the preceding section, Brandon's vulnerability was known (or should have been known) by prison officials. Second, according to the Palakovics, it was common knowledge that the prison was being investigated by the DOJ for "provid[ing] inadequate mental health care to prisoners who have mental illness, fail[ing] to adequately protect such prisoners from harm, and subject[ing] them to excessively prolonged periods of isolation, in violation of the Eighth Amendment of the U.S. Constitution." J.A. 77. And, it can hardly be disputed that it is widely known and understood that solitary confinement is "characterized by extreme deprivation of social interaction and environmental stimulation." J.A. 68. Finally, and perhaps most importantly, prison officials were aware of a history of self-harm and suicide in SCI Cresson's solitary confinement unit in the recent past: In

2011 alone, "14 of the 17 documented suicide attempts at SCI Cresson occurred in the solitary confinement units," J.A. 78, and there were "dozens of incidents involving prisoners on the mental health roster engaging in self-harm in the isolation units, while just two such incidents occurred in the general population." J.A. 78–79.

These non-conclusory allegations support an inference that, despite knowing of Brandon's vulnerability and the increased risk of suicide that solitary confinement brings, the defendants disregarded that risk and permitted Brandon to be repeatedly isolated in solitary confinement anyway. That is sufficient to satisfy the plausibility standard and proceed to discovery on the vulnerability to suicide claims as to defendants Harrington, Rathore, Eidsvoog, Boyles, and Luther.

B.

The Palakovics also asserted a vulnerability to suicide claim against MHM, the corporation providing medical services at SCI Cresson. To state a claim against a private corporation providing medical services under contract with a state prison system, a plaintiff must allege a policy or custom that resulted in the alleged constitutional violations at issue. *Natale v. Camden Cty. Corr. Facility*, 318 F.3d 575, 583–84 (3d Cir. 2003). Therefore, the question is whether the Palakovics sufficiently alleged that MHM had a policy or custom

48

that resulted in a violation of Brandon's Eighth Amendment rights.

According to the amended complaint, MHM "was responsible for under-staffing psychiatric staff, not providing necessary forms of mental health treatment such as suicide risk assessments and counseling, failing to ensure adequate frequency of mental health appointments and that such be conducted in a clinically appropriate setting, and failing to provide proper medical oversight of medication regimes." J.A. 76. Further, MHM "was aware that SCI Cresson was warehousing people who were seriously mentally ill and those who were vulnerable to suicide in solitary confinement, that this practice was psychologically harmful and medically contraindicated, and they did nothing to intervene on behalf of their incarcerated patients." *Id.* The Palakovics buttressed these allegations with findings from the DOJ's investigation and subsequent Report. The DOJ Report, as restated and alleged in the amended complaint, specifically found that the mental health care provided by SCI Cresson during the time of Brandon's incarceration suffered serious problems including "a dearth of mental health treatment," "insufficient[] staff[ing]," and "poor screening and diagnostic procedures." J.A. 79–80 (quoting DOJ Report).

The Palakovics alleged that MHM's policies of understaffing and failing to provide proper treatment resulted in Brandon's isolation, untreated mental illness,

49

and eventual suicide. At the motion to dismiss stage, these allegations are sufficient to proceed to discovery. Absent discovery, the Palakovics could not possibly have any greater insight into MHM's exact policies or their impact on Brandon.

## C.

Next, the Palakovics raised a vulnerability to suicide claim against supervisory defendants Wetzel, Cameron, Luther, and Boyles based upon policies and practices at SCI Cresson, and a related claim for a failure to train SCI Cresson staff "on how to manage prisoners with serious mental illness and those that were vulnerable to suicide in a manner that would not cause mental health injuries." J.A. 88.

As previously discussed, a plaintiff may state an Eighth Amendment claim against a supervisor based on policies or practices where the plaintiff alleges that the supervisors "knew or were aware of and disregarded an excessive risk to the [plaintiff's] health or safety[.]" *Beers-Capitol*, 256 F.3d at 135. In somewhat cursory fashion, the District Court held that the Palakovics failed to allege facts sufficient to establish supervisory liability.[25] Second Dismissal, 2016 WL 707486 at *8.

---

[25] Although the District Court applied the *Sample* test, we analyze the supervisory liability claims under the *Farmer* test. *See supra* n.17. In any event, both tests are satisfied

50

We conclude, in disagreement with the District Court, that the risk here was alleged with sufficient specificity and factual support to be so obvious that the Palakovics did plead a plausible claim for supervisory liability.

The Palakovics claimed that the supervisory defendants established a policy whereby mentally ill and suicidal prisoners like Brandon were repeatedly placed in solitary confinement rather than provided with adequate mental health treatment. In the Palakovics' view, the risk of suicide created by repeatedly placing mentally ill prisoners in a small cement cell with minimal outside visibility, few possessions, and limited human interaction is obvious. And, even if it were not obvious, the prior experience of the supervisors—who were aware of other instances of suicide and self-harm by prisoners in solitary confinement—made them aware of the unreasonable risk. Among other things, the Palakovics cite a specific incident in May of 2011, less than a year before Brandon's suicide, in which another mentally ill prisoner committed suicide while in solitary confinement. They allege that the supervisory defendants would have been aware of that and similar recent incidents of self-harm. They further allege that the DOJ's investigation, initiated

---

by a showing that the risk was "so great and so obvious" because "the risk and the failure of supervisory officials to respond will alone support" supervisory liability. *Beers-Capitol*, 256 F.3d at 134–35.

eight months before Brandon's suicide, would have contributed to their awareness of the potential dangers of holding mentally ill and suicidal prisoners in solitary confinement.

Similar to the policy claim, a failure to train claim requires a plaintiff to "identify a failure to provide specific training that has a causal nexus with his or her injury and must demonstrate that the failure to provide that specific training can reasonably be said to reflect a deliberate indifference to whether constitutional deprivations of the kind alleged occur." *Colburn II*, 946 F.2d at 1030. Specifically, in a prison suicide case, this means that the plaintiff must (1) "identify specific training not provided that could reasonably be expected to prevent the suicide that occurred" and (2) "demonstrate that the risk reduction associated with the proposed training is so great and so obvious that the failure of those responsible for the content of the training program to provide it can reasonably be attributed to a deliberate indifference to whether the detainees succeed in taking their lives." *Id.*

According to the Palakovics, despite the risk and the obviousness of the need to correct it, the supervisors failed to train officials on how to recognize and properly manage seriously mentally ill and suicidal prisoners, failed to provide suicide prevention training, failed to provide training on the adverse impact of solitary confinement on those with mental illness, and failed to

train non-medical staff on the importance of consulting with mental health care providers concerning discipline and management of mentally ill prisoners. The supervisors were alleged to have provided essentially no training on suicide, mental health, or the impact of solitary confinement, and simply acquiesced in the repeated placement of mentally ill prisoners like Brandon in solitary confinement.

According to the Palakovics, the supervisors were responsible for the policies concerning the treatment of mentally ill prisoners that gave rise to an unreasonable risk of Brandon's suicide, as well as the failure to provide specific types of training that could reasonably have prevented it. We must take the factual allegations of the amended complaint as true, and those facts are sufficient to support claims against the supervisory defendants.

## VII.

Based on the foregoing, we conclude that the Palakovics properly pleaded claims under the Eighth Amendment in both their original and amended complaints. Accordingly, we will vacate the District Court's dismissal orders entered on June 26, 2015, and February 22, 2016, and will remand this matter to the District Court for further proceedings. On remand, the District Court should permit the Palakovics to file a second amended complaint setting forth their Eighth Amendment claims concerning conditions of

53

confinement, inadequate mental healthcare, vulnerability to suicide, and failure to train.[26]

---

[26] We reiterate that any second amended complaint may not plead claims against the three voluntarily dismissed defendants (Kushner, Reed, and Dous) or the defendants named in the original complaint who were not named in the amended complaint (Michelle Houser, Morris Houser, Francis Pirozzola, Shawn Kephart, and John Does #1-6), as the Palakovics have abandoned their claims against each of those individuals. *See supra*, notes 11, 13. In addition, the Eighth Amendment claims should proceed against the remaining defendants in their individual capacities only. *See supra*, note 20.