NOT PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

_____

No. 21-1416

_____

DOMINIQUE DIORIO, (administratrix of the estate of Joseph Diorio),
                                                              Appellant
v.

SUPERINTENDENT LAUREL R. HARRY; L.P.N. KATHERINE MACKIE; R.N. UZA
JESUSA JACOBY; R.N. JOSEPH SILVA; M.D. R LAURENCE; R.N. BETH HERB;
PH.D. LUCAS MALISHCHAK; WILLIAM WARNER; JAMES SIMMS; JAMES
PREBICH; ANTHONY RICCI; BLAINE HUGNEY; MICHELLE NARDOZZI

_____

On Appeal from the United States District Court
for the Middle District of Pennsylvania
(D.C. No. 1-16-cv-01678)
Magistrate Judge: Honorable Karoline Mehalchick**

_____

Submitted Pursuant to L.A.R. 34.1(a) on
December 13, 2021

_____

Before: GREENAWAY, JR., KRAUSE, and PHIPPS, *Circuit Judges*

(Opinion filed: August 1, 2022)

_____

OPINION*

_____

_____

* This disposition is not an opinion of the full Court and pursuant to I.O.P. 5.7 does not
constitute binding precedent.

GREENAWAY, JR., *Circuit Judge*

Losing a loved one to suicide is a tragic event. When such tragedy occurs while one is in custody is also baffling. Unfortunately, all tragedies do not provide those grieving with a path to recovery in civil litigation. Here, Appellant appeals the District Court's grant of summary judgment to Defendants—state employees—after the suicide of her husband while in custody at a state correctional institution. The District Court's grant of summary judgment was not in error. We will affirm.

**I**

The Pennsylvania Department of Corrections maintains procedures for assessing a detainee's mental health once an individual arrives and throughout their period in custody. The procedures include transferring prior suicide risk screenings and conducting new ones, such as when a person is placed in the Restricted Housing Unit ("RHU"). The procedures also include immediately referring to psychologists any individual who presents certain risk indicators of suicide, and contingencies for times when practitioners are unavailable.

Mr. Joseph Diorio entered State Correctional Institution ("SCI") Graterford on May 5, 2014. Upon entry, he completed two Suicide Indicator Checklists, in addition to a mental health questionnaire. He answered affirmatively to three risk indicators on the first checklist, and to one risk indicator on the second checklist. These indicator

---

** Pursuant to 28 U.S.C. § 636(c) and Fed. R. Civ. P. 73, the parties consented to the Magistrate Judge conducting all proceedings and ordering the entry of final judgment.

categories included "Inmate shows signs of depression," "Inmate has recent family change," and "Inmate has recent legal status change." The first checklist also included a note that he "fe[lt] depressed" and had a daughter born the prior month. Although in his Initial Reception Mental Health Questionnaire he reported that he did not have a history of suicide attempts, he reported having seen a psychologist two years prior following the death of his father in 2012. He also revealed that he had a history of depression, may have taken drugs within "[d]ays" of arriving to the facility, and had been prescribed psychotropic medication in the past. He denied current suicidal ideations or past instances of trying to hurt or kill himself.

When he was transferred to SCI Camp Hill four days later, Mr. Diorio disclosed in his transfer system paperwork that he had had a history of depression, though he again denied current thoughts of self-harm. He also denied being on any current medication. Because of his history of depression and anxiety, the facility placed Mr. Diorio on a list for follow-up services with the psychology department. However, the next day, Mr. Diorio was placed in the RHU pending a hearing on misconduct for refusing to return to his cell and swearing at an officer in protest. Unbeknownst to any prison personnel, Mr. Dioro was allegedly being harassed by other detainees and incorrectly targeted as both gay and a child molester.

When he arrived at the RHU, he completed another suicide checklist. Mr. Diorio answered affirmatively to one of the suicide risk indicators, but denied suicidal ideations or other hallucinations. Because it was a weekend, at a time when a psychologist was unavailable, licensed practical nurse Katherine Mackie ("Mackie") was contacted. She

3

conducted a follow-up assessment that same day. During the assessment, Mr. Diorio once again did not reveal any issues with other detainees. He disclosed this information three days later, on May 13, 2014, during the misconduct hearing. He also, for the first time, requested protective custody and shared that he feared for his life. The hearing examiner did not report Mr. Diorio's fears to anyone. Mr. Diorio committed suicide the next day on May 14, 2014.

Appellant, widow and administratrix of Mr. Diorio's estate, sued the named Defendants, all of whom are state employees of the Pennsylvania Department of Corrections.[1] Appellant sought various damages on four counts arising under 42 U.S.C. § 1983 and state law. The District Court granted summary judgment to Defendants on all four counts. Appellant now appeals.[2]

## II

The District Court had jurisdiction over the federal civil rights and state law claims pursuant to 28 U.S.C. §§ 1331, 1343, and 1367. We have jurisdiction to review the District Court's summary judgment ruling pursuant to 28 U.S.C. § 1291.

---

[1] Although all of the individual Defendants were employees of the State, not all held positions at SCI Camp Hill.

[2] Appellant's lawsuit named Laurel Harry, Joseph Silva, Lucas Malishchak, Beth Herb, Katherine Mackie, Liza Jacoby, James Simms, William Warner, James Prebich, Anthony Ricci, Blaine Hugney, and Michelle Nardozzi. In her brief in opposition to the motion for summary judgment, Appellant voluntarily dismissed her claims against Jacoby, Laurence, Silva, Warner, Simms, Prebich, Ricci, Hugney, and Nardozzi. The District Court nevertheless granted summary judgment as to all Appellees, including the voluntarily dismissed Appellees. On appeal, Appellant challenges the grant of summary judgment as to all Appellees, including those she previously had claimed to have voluntarily dismissed. We address this issue in Section III, *infra*.

This Court exercises plenary review and applies the same standards as the district court when reviewing motions for summary judgment. *Hall v. Millersville Univ.*, 22 F.4th 397, 402 (3d Cir. 2022). Summary judgment is appropriate only if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). We may only review "the record as it existed at the time summary judgment was entered." *Webb v. City of Phila.*, 562 F.3d 256, 259 (3d Cir. 2009) (citation and internal quotation marks omitted).

### III

Appellant appeals the District Court's grant of summary judgment on four claims arising under 42 U.S.C. § 1983: deliberate indifference, *Monell*/failure to train liability, supervisory liability, and conspiracy in violation of state law. We hold that summary judgment was appropriately granted to Defendants-Appellees on all claims, and we will address each claim in turn. Before turning to the merits, however, we must address the District Court's decision to grant summary judgment to all named defendants.

Appellant's lawsuit originally named Laurel Harry, Joseph Silva, Lucas Malishchak, Beth Herb, Katherine Mackie, Liza Jacoby, James Simms, William Warner, James Prebich, Anthony Ricci, Blaine Hugney, and Michelle Nardozzi. In her brief in opposition to the motion for summary judgment, Appellant purported to voluntarily dismiss her claims against Jacoby, Laurence, Silva, Warner, Simms, Prebich, Ricci, Hugney, and Nardozzi. Without issuing a court order or further addressing the purportedly dismissed defendants, the District Court granted summary judgment as to all defendants. This was error.

5

Federal Rule of Civil Procedure 56(a) provides that a court granting summary judgment "should state on the record the reasons for granting or denying the motion." Fed. R. Civ. P. 56(a). Here, the District Court acknowledged Appellant's purported dismissal of several defendants, but it never stated any other reason for granting summary judgment as to the "dismissed" defendants. To the extent that the District Court granted summary judgment on the basis of a dismissal that never occurred, that decision was in error. [3] Accordingly, we will vacate District Court's grant of summary judgment as to Defendants Jacoby, Laurence, Silva, Warner, Simms, Prebich, Ricci, Hugney, and Nardozzi and remand with instructions to either enter an order dismissing the claims against those defendants or to enter a summary judgment order with reasons.

## A. Deliberate Indifference

The Eighth Amendment of the Constitution of the United States prohibits inhumane conditions or treatment of incarcerated persons. *Farmer v. Brennan*, 511 U.S.

---

[3] While we have recognized that Federal Rule of Civil Procedure 41(a)(1)(A) allows a plaintiff to dismiss claims against individual defendants without a court order, *see Noga v. Fulton Financial Corp. Employee Benefit Plan*, 19 F.4th 264, 271 n.3 (3d Cir. 2021) (citing *Young v. Wilky Carrier Corp.*, 150 F.2d 764, 764 (3d Cir. 1945)), that rule only allows for voluntary dismissal via either: "(i) a notice of dismissal before the opposing party serves either an answer or a motion for summary judgment; or (ii) a stipulation of dismissal signed by all parties who have appeared," Fed. R. Civ. P. 41(a)(A). Here, Appellant only "dismissed" the other defendants in her brief in opposition after a motion for summary judgment was filed, and there is no record of a signed stipulation by all parties. Accordingly, Rule 41(a) did not permit voluntary dismissal by Appellant. Instead, the District Court should have issued a court order pursuant to Federal Rule of Civil Procedure 41(a)(2) or granted summary judgment with reasoning as to the purportedly dismissed defendants in accordance with Federal Rule of Civil Procedure 56(a).

825, 832–33 (1994) (citations omitted).  Under this Amendment, the suicide of a person in correctional custody may support recovery under 42 U.S.C. § 1983.  *Colburn v. Upper Darby Twp.*, 946 F.2d 1017, 1023 (3d Cir. 1991) (citations omitted) ("*Colburn II*").  But, such claims "present[] difficult issues because no state actor directly inflicted harm on [the individual]."  *Id*. at 1023.

The successful appellant must show that state officials were deliberately or recklessly indifferent to the risk of suicide.  *Farmer*, 511 U.S. at 828 (citations omitted) ("A prison official's 'deliberate indifference' to a substantial risk of serious harm to an inmate violates the Eighth Amendment.").  This showing entails demonstrating: (1) that the person who committed suicide had a particular vulnerability to suicide; (2) that the custodial official knew or should have known about; and (3) that the custodial official acted with deliberate or reckless indifference to the person's particular vulnerability.  *Palakovic v. Wetzel*, 854 F.3d 209, 218 (3d Cir. 2017) (citations omitted).  These three elements are conjunctive, so the absence of one is fatal to the claim.  *Colburn II*, 946 F.2d at 1026–27 (disposing of a deliberate indifference claim where the custodial official did not know or have reason to know of the decedent's particular vulnerability to suicide).

In the case before us, the District Court found that although Mr. Diorio had a particular vulnerability to suicide, correctional officials did not know of that vulnerability.  We disagree with the District Court that Mr. Diorio had a particular vulnerability to suicide.[4]  Further, even assuming for the sake of argument that a

---

[4] The District Court did not reach the deliberate or reckless indifference element. Generally, we will not address an issue that has not first been passed on by the district

reasonable juror could conclude that the state knew or should have known of the vulnerability, there is no evidence that the state acted with deliberate indifference to that knowledge.  Thus, as explained further below, we will affirm the District Court's grant of summary judgment to Defendants on the deliberate indifference claim.

### 1. Particular Vulnerability

A particular vulnerability to suicide "speaks to the degree of risk inherent in the detainee's condition."  *Woloszyn v. Cnty. of Lawrence*, 396 F.3d 314, 320 (3d Cir. 2005) (citation and internal quotation marks omitted).  There must be a "strong likelihood, rather than a mere possibility, that self-inflicted harm will occur."  *Id.* (quoting *Colburn II*, 946 F.2d at 1024).  This "strong likelihood of suicide . . . [must also have been] so obvious that a lay person would easily recognize the necessity for preventative action."  *Id.*  (quoting *Colburn II*, 946 F.2d at 1025).  The District Court found that Appellant presented sufficient evidence for a reasonable juror to conclude that Mr. Diorio had a particular vulnerability to suicide.  We disagree.

Our precedent requires that in order to satisfy particular vulnerability, there must be a "strong likelihood, rather than a mere possibility, that self-inflicted harm will occur." *Woloszyn*, 396 F.3d at 320.  Based on this standard, the facts in the record here are

---

court.  *Goldenstein v. Repossessors Inc.*, 815 F.3d 142, 149 (3d Cir. 2016).  However, "when the factual record is developed and the issues provide purely legal questions, upon which an appellate court exercises plenary review," we may make an exception.  *Id.* (citation and internal quotation marks omitted).  The deliberate indifference element presents a legal question.  The case before us is an appeal from a motion for summary judgment, which indicates that the record is fully, factually developed.  Therefore, in Section III.A.3, *infra*, we address the final element of the deliberate indifference claim even though the District Court did not.

insufficient for a reasonable juror to conclude that Mr. Diorio was particularly vulnerable to suicide at the time it occurred.

Among other opinions, Appellant's expert's report stated that: (1) individuals who newly arrive to a correctional institution are at a heightened risk for suicide; (2) it is well known in the medical field that combined depression and anxiety heightens the risk of suicide; (3) a more thorough, formal evaluation should have been completed sooner and Mr. Diorio should have been monitored until the evaluation occurred; and (4) individuals who fear for their safety and request protective custody are "at extremely high risk for suicide if that protective custody is denied." R.R. 28–29. Yet, the underlying facts in this case fall short of the "strong likelihood" standard as we have recently applied it.

In *Palakovic*, we concluded that the decedent had a particular vulnerability to suicide. *Palakovic*, 854 F.3d at 230. The decedent there informed staff that he had attempted suicide in the past and engaged in self-inflicted harm within 8 months of arriving at the state facility. *Id.* at 216. In fact, the decedent had also informed staff that he had "made plans about how to kill himself." *Id.* The decedent also had "an array of serious mental health issues" known to heighten the risk of self-harm, *id.* at 226, 230, received the Pennsylvania Department of Correction's lowest mental health stability rating, *id.* at 216, and experienced "'multiple 30[-]day stints in solitary confinement'" while at the facility, *id.* at 217. Even more, all of this happened in the context of a visit by the United States Department of Justice specifically investigating allegations that the facility had "provided inadequate mental health care to prisoners who have mental

9

illness, [and] failed to adequately protect such prisoners from harm[,]" among other issues. *Id*.

There are notable differences between *Palakovic* and the present case. Although Mr. Diorio presented with three suicide risk indicators in his first questionnaire, he reported a single risk for each of his two succeeding questionnaires. Further, whereas the decedent in *Palakovic* had a history of self-harm and revealed to staff his plans to kill himself, Mr. Diorio repeatedly denied current suicidal ideations or past instances of trying to hurt or kill himself. *Palakovic*, 854 F.3d at 216. As to his confinement, although Mr. Diorio spent three days in the RHU, this duration was far less than the multiple 30-day stints preceding the decedent's suicide in *Palakovic*. *Id.* at 216–17. Finally, though Mr. Diorio had a history of depression, the record does not show the same "array of serious mental health issues" that contributed to the strong likelihood of the decedent's suicide in *Palakovic*. *Id*. at 226.

Under the facts presented, we cannot conclude, as is necessary, that Mr. Diorio's suicide was "so obvious that a lay person would easily recognize the necessity for preventative action." *Woloszyn*, 396 F.3d at 320 (citation and internal quotation marks omitted). Therefore, we disagree with the District Court on this prong.

**2. Subjective Knowledge**

Proving a particular vulnerability is only the threshold requirement of a deliberate indifference claim. A successful appellant must also demonstrate that the custodial officials knew or should have known of the vulnerability. *Colburn II*, 946 F.2d at 1024. The custodial officials need not have "a subjective appreciation of the detainee's

10

'particular vulnerability' . . . [yet there must be] something more culpable on the part of the officials than a negligent failure to recognize the high risk of suicide." *Id*. at 1025.

The District Court concluded that Appellant was unable to satisfy this element. It reasoned that "Mackie did not have actual knowledge as to Decedent's vulnerability to suicide because she did not view any of the documents that would have pointed to an assumption of such vulnerability." R.R. 97. Although our case law does not require <u>actual</u> knowledge, *Colburn II*, 946 F.2d at 1024, there must still be enough in the record to establish that defendants knew or should have known that the harm would come about. *See Palakovic*, 854 F.3d at 229–31. Such is not the case here.

Appellant argues that licensed practical nurse Mackie lied under oath when she denied knowledge of Mr. Diorio's particular vulnerability to suicide. She asserts that Mackie's truthfulness is something for a jury to determine.[5] The evidence that might be

---

[5] In addition to discussing Mackie's deposition, Appellant also discusses the depositions of Beth Herb and Ezioma Onwukanjo, both of whom were registered nurses at the facility. Appellant asserts that Herb's deposition clearly shows that Mr. Diorio's records (i.e., his prior suicide risk indicator checklists) would have been transferred from SCI Graterford to SCI Camp Hill as a matter of processing. Appellant's Br. at 12 (citing R.R. 235–36). In the cited deposition pages for Herb, Herb's response to the question whether "medical and psychological records come with [transferees]" was "[t]hat's my understanding, yes." R.R. 236. However, although Herb stated that she had "seen" the initial mental health questionnaire, the deposition question and response were unclear as to when Herb saw the form and in what context. *Id.* For instance, she could have seen the form in preparation for the deposition. As the transcript later clarified, Herb was being deposed as a designated representative for Rule 30(b)(6) purposes; she was "not a fact witness" because she "had no interaction at all . . . with Mr. Diorio." *Id.* at 238.

Appellant also asserts that Onwukanjo, who is not a defendant in this lawsuit, affirmatively testified that she saw Mr. Diorio's medical chart. Appellant's Br. at 12 (citing R.R. 129–32). In her deposition, Onwukanjo stated that she reviewed Mr. Diorio's medical chart and referred him to psychology because he was not on medication.

11

pointed to in the record in support of this element appears as a part of hypotheticals posed to Mackie during her deposition. At the time, Mackie admitted that the prior forms would normally be something included in the transferred medical files. Thus, the earlier May 5 suicide risk indicator checklists would have been "something that [she] *could* have seen." *Id*. 187 (emphasis added). Further, answering hypothetically, Mackie affirmed that if she had before her Mr. Diorio's "history . . .[of] anxiety, depression, [and] zero meds," she would have viewed it as "clinically significant." R.R. 195. Yet, these responses do not point to affirmative knowledge about a *strong likelihood* of suicide.

Mackie's answers to the hypotheticals posed do not negate her repeated assertions that she "d[id] not recall" seeing the earlier intake paperwork prior to conducting the pre-RHU screening. R.R. 185, 191. Further, at most, these deposition responses might show a "negligent failure to recognize the . . . risk of suicide[,]" which is not enough to prevail on this element of the claim. *Colburn II*, 946 F.2d at 1025.

Our recent cases have also evinced stronger factual support than present here when concluding that officials were aware of a decedent's particular vulnerability to suicide. As noted before, in *Palakovic*, we discussed the custodial officials' awareness of the

---

Yet, even having reviewed Mr. Diorio's medical chart does not make it reasonable for us to infer that the facility knew or should have known of the impending suicide. We have already concluded that Mr. Diorio did not have a particular vulnerability to suicide, so there was no strong likelihood that one would occur or that the facility could have anticipated. Further, she also stated that she "[did not] recall seeing" Mr. Diorio's initial reception mental health questionnaire. R.R. 131. We decline to decide this possibility as a matter of law and, in any event, it would not be enough to prevail on a deliberate indifference claim.

decedent's past suicide attempts, his low stability rating, his multiple mental illness diagnoses known to heighten the risk of self-harm, his placement on a "mental health roster[,]" and an ongoing federal Justice Department investigation for failure to provide adequate care to detainees with mental health needs. *Palakovic*, 854 F.3d at 216–7, 229–30. Here, although Mr. Diorio had a history of depression and anxiety, he did not have a similar array of mental health issues. It is also undisputed that he repeatedly denied to staff past acts of self-harm and experiencing suicidal ideations or hallucinations. This situation does not compare to the decedent in *Palakovic* who informed staff of his past attempts and future plans of suicide. *Id.* at 216. As such, it is not "quite reasonable to infer that prison officials had (or should have had) knowledge of" Mr. Diorio's impending suicide. *Palakovic*, 854 F.3d at 226.

Lastly, even assuming for the sake of argument that a reasonable juror could conclude that staff knew or should have known of the risk of harm, Appellant is unable to show that the officials acted with deliberate indifference to this risk.

### 3. Deliberate Indifference

Once an appellant demonstrates that there was a particular vulnerability to suicide, which custodial officials knew or should have known about, the appellant must then show that the custodial officials acted with deliberate indifference in failing to prevent the harm that occurred. *Colburn II*, 946 F.2d at 1023. Deliberate indifference is a high bar. Acting with deliberate indifference to a risk of suicide "is to recklessly disregard a substantial risk of serious harm." *Palakovic*, 854 F.3d at 227 (citation and internal quotation marks omitted). Although in this context our Court has declined to further

13

define the terms "deliberate indifference" and "reckless indifference," we have stated that the necessary behavior is more than a mere "negligent failure to recognize the high risk of suicide." *Colburn II*, 946 F.2d at 1025; *see also Palakovic*, 854 F.3d at 224 n.15 (declining to precisely define the terms) and *Woloszyn*, 396 F.3d at 320–21 (same).

Here, it does not appear that the officials acted with reckless or deliberate indifference to Mr. Diorio's risk. For instance, Mr. Diorio was in custody for a total of 11 days; five days at the Camp Hill facility where the suicide occurred. This is not a substantial amount of time for staff to become aware of the impending suicide, given the repeated responses to intake surveys about no past attempts at self-harm and no current suicidal ideationss or other hallucinations. All the more, Mr. Diorio's 11 days in custody, at two separate facilities, is significantly less than the duration of custody prior to the suicide in other cases where there was a finding of deliberate indifference. *See e.g.*, *Palakovic*, 854 F.3d at 216 (discussing events over decedent's thirteen-month stay in a state facility). There is also no allegation that the facility failed to have any procedures in place or conducted no screening whatsoever. *Palakovic*, 854 F.3d at 217 (discussing an allegation that the facility "lack[ed] . . . a systematic program for screening and evaluating prisoners" and that "no comprehensive suicide risk assessment was performed.") In fact, at the time of his death, there was a psychological evaluation pending for Mr. Diorio.

14

We conclude that the record does not support that officials showed a reckless or deliberate indifference to the risk of suicide. We will affirm the District Court's grant of summary judgment on the deliberate indifference claim.[6]

## B. *Monell* and Supervisory Liability

### 1. *Monell* Municipal Liability

Appellant's next claim rests upon the alleged failure to train and supervise subordinates. Under *Monell v. Department of Social Security of the City of New York*, a person may bring a § 1983 claim against local government officials as "'persons' within the meaning of 42 U.S.C. § 1983." 436 U.S. 658, 662 (1978). This local government liability can arise where there was a failure to train or institute appropriate policies and procedures, and that failure amounted to a "deliberate indifference to the rights of persons with whom the [custodial official] c[a]me into contact." *City of Canton v. Harris*, 489 U.S. 378, 388 (1989).

*Monell* liability applies only to local governments. *Monell*, 436 U.S. at 690 n.54 ("Our holding today is, of course, limited to local government units which are not considered part of the State for Eleventh Amendment purposes.") Here, the individual defendants are employees of the State. Consequently, liability against the defendants cannot be sustained under *Monell*, and summary judgment was properly granted.

---

[6] Our Court has, by no means, established the egregious facts in *Palakovic* as the floor for successful deliberate indifference claims. Yet, other cases from our Court have similarly denied relief on lesser facts. *See e.g.*, *Colburn II*, 946 F.2d at 1025–27 and *Woloszyn*, 396 F.3d at 322–24. Regardless, district courts must rigorously analyze the facts alleged or the record before it in any given case prior to finding that a plaintiff cannot move forward on a deliberate indifference claim.

**2. Section 1983 Supervisory Liability**

Likewise, the District Court properly concluded that the record also did not support supervisory liability for the named defendants.

*Monell* does not embrace *respondeat superior* as a cognizable claim under its doctrine. *Monell*, 436 U.S. at 691. But, our Court has recognized in limited circumstances that supervisors may be held liable for the unlawful conduct of subordinates. *Chavarriaga v. New Jersey Dep't of Corr.*, 806 F.3d 210, 227 (3d Cir. 2015). For supervisory liability to attach in civil rights cases, defendants must have had "personal involvement in the alleged wrongs." *Id.* at 222 (citing *Rode v. Dellarciprete*, 845 F.3d 1195, 1207 (3d Cir. 1998)); *see also Rizzo v. Goode*, 423 U.S. 362, 377 (1976) (requiring defendants to have played an "affirmative part" in the unlawful conduct). Personal involvement entails "the defendant's participation in or actual knowledge of and acquiescence in the wrongful conduct." *Chavarriaga*, 806 F.3d at 222. (citations omitted). To the extent that a supervisor may be held liable for a subordinate, the policy or practice must, in part, have created an unreasonable risk of injury to which the supervisor was indifferent. *Id.*

*Chavarriaga* succinctly sets forth these requirements. For supervisory liability under § 1983, an appellant must:

> (1) identify the specific supervisory practice or procedure that the supervisor failed to employ, and show that (2) the existing custom and practice without the identified, absent custom or procedure created an unreasonable risk of the ultimate injury, (3) the supervisor was aware that this unreasonable risk existed, (4) the supervisor was indifferent to the risk; and (5) the underling's violation resulted from the supervisor's failure to employ that supervisory practice or procedure.

16

*Id.* (quoting *Brown v. Muhlenberg Twp.*, 269 F.3d 205, 216 (3d Cir. 2001)).

Here, Appellant asserts that Defendants Herb, Malishchak, and Harry were "directly responsible for policy and procedure [at] SCI Camp Hill." Appellant's Br. at 16. Yet, even assuming, without deciding, that these defendants were supervisors for purposes of this claim, the record does not support that: (1) an existing policy or practice that they failed to employ created an unreasonable risk of injury; (2) the supervisors were aware that the unreasonable risk existed, (3) the supervisors were indifferent to the risk; and (4) the subordinate employee's violation resulted from the supervisor's failings. *Chavarriaga*, 806 F.3d at 227. The facility had policies that required early and continued assessment of an individual's mental health. The policies included reviewing prior suicide risk screenings and conducting new ones. They also included immediately referring to psychologists individuals who presented certain risk factors, and contingencies for times when practitioners were unavailable.

Appellant alleges a practice where licensed practical nurses were permitted to make decisions, which purportedly should have been the domain of the facility's registered nurses. Even assuming, without deciding, this were the case, the record and argument on appeal are devoid of additional facts that could support § 1983 liability for supervisors under a policy or practice theory. Namely, the record does not support a conclusion that supervisors were aware of and indifferent to an unreasonable risk of injury, and that a subordinate's allegedly unlawful conduct resulted from the supervisor's failings.

17

We will affirm the grant of summary judgment to Defendants on both the *Monell* and supervisor liability claims.

**C. Conspiracy**

On appeal, Appellant's brief does not address the conspiracy claim, for which the District Court also granted summary judgment in favor of Defendants. Therefore, because Appellants forfeited this issue, we will not address it. *Barna v. Bd. of Sch. Dirs.*, 877 F.3d 136, 147 (3d Cir. 2017) ("'[F]orfeiture is the failure to make the timely assertion of a right,' an example of which is an inadvertent failure to raise an argument." (alteration in original) (quoting *United States v. Olano*, 507 U.S. 725, 733 (2017))).

**IV**

For the foregoing reasons, we will affirm in part and vacate in part the District Court's grant of summary judgment on all claims.